Rosia Lelia PROBST, By Pearl Probst, Her Next Friend, Appellant,

v.

Eugene L. SEYER and Berline Matthews, Doing Business as Matthews Mill, Respondents.

No. 48578.

Supreme Court of Missouri, Division No. 1.

Jan. 8, 1962.

Motion for Rehearing or for Transfer to Court en Banc Denied Feb. 12, 1962.

George A. Murray, St. Louis, for appellant.

Finch, Finch & Knehans, Jack O. Knehans, Cape Girardeau, for respondent Seyer.

Riddle, Baker & O'Herin, Veryl L. Riddle, Charles H. Baker, Edward F. O'Herin, Malden, for respondent Berline Matthews.

HOLLINGSWORTH, Judge.

On April 12, 1957, in Cape Girardeau County, plaintiff, Rosia Lelia Probst, the minor daughter of Pearl Probst, was injured when an automobile driven southward by her father, in which plaintiff was a passenger, came into head-on collision with a northbound automobile driven by defendant Eugene L. Seyer, as the Probst automobile was engaged in passing a southbound motor truck operated by an alleged servant of defendant Berline Matthews. In this action plaintiff, by her father as next friend, sought to recover damages in the sum of $25,000 from defendants for the injuries resulting from that collision. Trial of the case resulted in the return of a court-directed verdict in favor of both defendants at the close of plaintiff's evidence. Plaintiff has appealed from the judgment rendered in accordance with the verdict. Her contention is that the evidence introduced by her would support a jury finding: (1) that as the Probst car was passing the Matthews truck, the driver of the truck negligently varied its speed in violation of certain statutory rules of the road, thereby making it impossible for the driver of the Probst car to return it to its lane in the rear of the truck or to pass in front of the truck in time to avoid the oncoming Seyer car; and (2) that under the circumstances shown Seyer (a) negligently drove his oncoming car at an excessive speed and (b) negligently failed to slacken its speed.

The facts not in issue may be stated narratively. In order, however, to interpret the oral testimony, much of it must be stated in the first person verbiage of the two witnesses testifying in behalf of plaintiff.

Plaintiff is one of eight children, some of whom on the date of the collision were attending the School for the Blind in St. Louis. Mr. and Mrs. Probst and four of their children, plaintiff, James, Frieda and LeRoy, were enroute to their home from the School for the Blind in Mr. Probst's two-seated 1949 Chevrolet passenger car driven by Mr. Probst. As they rode south on Highway No. 61, a north-south, two-lane, concrete-paved highway, they came to the rear of defendant Matthews' south

bound trailer-tractor truck, which they followed for some 15 miles.

Mr. Probst testified: I figure I had been right close to it for 15 miles. I stayed in a safe distance in case there would be somebody come around me; around 10 feet, I believe. I guess I was going around 30. My car and brakes were in good shape. I believe it was around 7:00, dusk, dark; I had my lights on; I believe the truck had its lights on. I had tried four or five times to pass but somebody was a-coming or a no-passing zone. There was a little grade and a small curve ahead of us, right close to us, pretty close and then near 700 yards down the line was a big curve. There is a dip, low place, about a block away where I couldn't see, but the big curve (700 yards away) ahead I could see plain. We was just getting ready to go down a hill. When I got even, my radiator with the tractor part of it, his radiator, this Mr. Seyer come around a curve 700 yards down the line and he was driving at such a high speed, by the truck picking up speed I seen I wasn't going to make it so I just slowed down speed and thought I'd get back in my own lane and some reason or other he slowed down, the truck slowed down, and of course I couldn't get back in my own lane then and I hit—my right front wheel hit the truck dual, his left dual. And it just kind of slapped a little bit and of course, I seen I couldn't get in my own lane and I just pulled off to the left hand shoulder, clear off, practically off the road on the left side and I wasn't going three miles an hour when Mr. Seyer hit me. It was around 400 yards down there where my car struck the truck. I pulled right across the road and got off on the other side of the road, practically drove plumb off. In fact, I believe I was off it. Of course, after he hit me why I was around six inches on the pavement. No other cars had tried to pass. I figure Mr. Seyer was going 65 to 70. My right fender hit his right fender. He tried awful hard to keep from hitting me by putting on his brakes. The pavement is 18

feet wide. When I started around the truck, it was traveling around 35 miles an hour, just started picking up speed there and just topped the hill. I just barely touched the truck, just kinda jarred him a little; I didn't lose control. I imagine Seyer hit me at a rate of 25 miles an hour, I imagine something like it. Seyer might have gotten off the shoulder about a foot, something like that. His right wheel was what come off. I was off the road first.

On cross-examination by counsel for defendant Seyer, Mr. Probst testified: My eyesight is not too good without glasses, I can see plenty good to drive. Plaintiff has had defective eyesight since birth. Frieda's vision is the same. My wife's vision is very poor, she's practically blind. I had a driver's license at the time of the wreck. They took them away from me after the accident. I have one now. After I told the state patrolman practically the same thing I have told the jury, I pleaded guilty to careless and imprudent driving; I didn't have no money to hire a lawyer. It was 700 yards down to the big curve. The dip was about a city block from where I tried to pass. I couldn't see into the dip. I don't remember whether I sounded my horn when I tried to pass. I just wouldn't know what speed the truck was going. I was going around 35. I don't remember whether the truck was going 22 miles an hour. When I started to pass the truck, he picked up speed because he was going up an incline. By the time I got even with him he was picking up speed. I was pulling out as we come up to the crest of the hill.

On cross-examination by counsel for defendant Matthews, Mr. Probst testified: The Matthews truck was going something like 22 miles an hour as it went over the crest of the hill. The truck stayed on its side of the road and was on down the hill when I collided with the Seyer car. There was a time and space I couldn't see. I couldn't have seen the Seyer car when it was in that dip if there'd of been light.

But I could have seen its lights if it had been in the dip. I got even with the truck radiator when I saw Seyer's car lights come around the big curve. When the radiator of my car was even with the radiator of the tractor, I couldn't see how close the Seyer car was but he was driving at a high speed.

"Q. Are you telling this jury and this court you could estimate this Oldsmobile's speed 700 yards away at night time? A. Well, he was coming awful fast. He was coming too fast for me to get in there."

I didn't have room to get in my own lane. I figured other cars behind the truck was awful close to me. I just couldn't see how close they was on me. I don't know whether the truck driver put on his brakes—he just slowed up speed, I imagine. I don't know whether I ever blew my horn or blinked my lights. I don't think I ever applied my brakes, I just slowed down. I don't have any idea how fast I was traveling. I have no idea how long it takes a car to cover a quarter of a mile going 65 miles an hour.

In reply to questions propounded by the court, Mr. Probst testified, in substance: I don't have any idea how far my car traveled from the time I was even with the truck and saw the Seyer car 700 yards away until my car collided with the Seyer car.

LeRoy Probst, on direct examination, testified in behalf of plaintiff: I am a preacher, aged 19 years. I was riding in the front seat with my father when my sister was hurt. I was coming from the School for the Blind, where I was then a student. My Dad, going 30 miles an hour, started to pass the truck. We started off the hill and then down the hill about 700 yards there was a big curve. When we started to pass the truck, it seemed to me that he kind of slowed down. The front end of our car got even with the front end of the truck. We ran along the side of the truck two, maybe three minutes. Dad couldn't get around it. As we got even with it, we seen

the [Seyer] car lights. Dad slowed and tried to get into his lane. My best judgment is that the Seyer car was going 75 or 80 miles an hour. Dad slowed, the truck slowed, our car slapped the back dual wheel of the truck, Dad swerved and went over on the left hand shoulder. I believe he was actually all the way off the pavement. When the front of our car struck the left rear dual wheel of the truck, the Seyer car was 400 yards away. All of the cars had their lights burning.

On cross examination by counsel for defendant Seyer, LeRoy Probst testified: I have weak eyes and attended the School for the Blind for two years. I could accurately judge the speed of the Seyer car as it came around the curve with its lights on, a distance of 700 yards. I do not and never did drive a car but I rode in many of them with my father and others. The [Seyer] car was going 75 or 80 miles an hour. I doubt if it could have been coming only 70, it could have been going 85 to 90. We drove alongside the truck two or three minutes. We drove alongside the truck about a minute when we first saw the Seyer car, then we drove alongside the truck about maybe a minute after we saw the Seyer car. I can't say for sure how fast Dad was driving, maybe 25 miles. I was worried about the car coming toward us, I wasn't worried about our car, because I knew my Dad had the wheel. I'd say that from the first time I saw the Seyer car 700 yards down the highway until it collided with our car about five minutes went by.

On cross-examination by counsel for defendant Matthews, LeRoy further testified: The truck never got on the wrong side of the road. Dad was going about 30 miles when he started to pull around it.

"Q. So you're saying that the truck maintained a speed of about 30 miles an hour from the time you started to pull out around until the time you got up

there even with its radiator? A. That's right.

\* \* \* \* \* \*

"Q. Well, did the truck put on its brakes? A. No.

\* \* \* \* \* \*

"Q. I'm wondering this, LeRoy, you testified that [the Seyer car] was going some 80 miles an hour or so at a point 700 yards down. the road, how do you judge distance of a car that far away under those conditions or speed of a car? A. Well see, here's the way it is, I've been in enough cars to know that a car can go mighty fast.

"Q. Yes. A. And I know this much about it. If a guy, 700 yards away, can come and hit another car within five minutes time he had to go awful fast.

"Q. So you're basing the estimate of his speed upon the period of time it took him to come from 700 yards away up to the point of the impact? A. That's right.

"Q. And that's the only basis that you are using for the estimate of the speed? A. Well, I know good and well, see, that he couldn't—he had to go that fast to hit—to be making that much speed to hit us that far away."

At the close of evidence adduced in behalf of plaintiff, the judge orally advised the jury, in substance, that he did not believe the evidence sufficient to warrant submission of the case and that he had suggested to counsel for the plaintiff that plaintiff's evidence relating to the occurrence be first adduced and that when that was done, it was apparent that neither defendant was "responsible for this incident." The jury, at the direction of the judge, then returned into court a verdict in favor of both defendants.

 Out of the welter of confusing, conflicting, vague and sometimes seemingly irresponsible testimony of plaintiff's two

witnesses we must determine whether a submissible case was made against either of the defendants on the grounds here asserted by plaintiff. In determining that question we consider the evidence in the light most favorable to those contentions, accepting as true all that is not entirely unreasonable or contrary to physical facts or natural laws and giving to plaintiff the benefit of all favorable inferences that reasonably may be drawn from such evidence. Holmes v. McNeil, 356 Mo. 763, 203 S.W.2d 665, 668; Nelms v. Bright, Mo., 299 S.W. 2d 483, 489. But, of course, the case is not to be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. Neither may any fact essential to submissibility be inferred in the absence of substantial evidentiary basis. In other words, liability cannot rest upon guesswork, conjecture or speculation beyond inferences reasonably to be drawn from the evidence. Willey v. Fyrogas Company, 363 Mo. 406, 251 S.W.2d 635, 642; Brawley v. Esterly, Mo., 267 S.W.2d 655, 659; Quinn v. St. Louis Public Service Co., Mo., 318 S.W.2d 316, 323; 32 C.J.S. Evidence § 1042, p. 1116. The question of whether the evidence in a given case is substantial is one of law for the court. Vietmeier v. Voss, Mo., 246 S.W. 2d 785, 787–788; Tharp v. Monsees, Mo., 327 S.W.2d 889, 899.

Plaintiff says that a submissible case was made against defendant Matthews by virtue of the provisions of section 304.016 and section 304.019 RSMo 1959, V.A.M.S. (All statutory references herein are to said revision unless otherwise indicated.) Insofar as here pertinent, section 304.016 provides:

"(1) An operator or driver overtaking and desiring to pass a vehicle shall sound horn before starting to pass except in cities where prohibited by ordinance;

\* \* \* \* \* \*

"(3) Except when overtaking and passing on. the right is permitted, the

driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle."

Section 304.019, insofar as here pertinent, provides:

"(1) An operator or driver when stopping, or when checking the speed of his vehicle, if the movement of other vehicles may reasonably be affected by such checking of speed, shall extend his arm at an angle below horizontal so that the same may be seen in the rear of his vehicle."

Admittedly, the Matthews truck was at all times on its proper (right) side of the highway. There was no evidence, direct or circumstantial, from which an inference may be drawn that any signal, either audible or visible, was given by the driver of the Probst car either prior to or during his effort to pass the Matthews truck. Indeed, Pearl Probst testified that he could not remember whether he gave any signal at all. Neither was there any evidence, direct or circumstantial, to support an inference that the driver of the Matthews truck knew, or, in the exercise of the highest degree of care, was chargeable with knowledge that the driver of the Probst car was trying to pass him, at least until that car came abreast of the truck, or that there was any purposeful change made in the speed of the truck during the course of the attempt made to pass it.

■ We have been cited to no Missouri case construing the above quoted portion of section 304.016, nor have we found any. In the case of Swinkels v. Wisconsin Michigan Power Co., 221 Wis. 280, 267 N.W. 1, 5, that court said of a similar statute: "It would be unreasonable to hold that a driver of an automobile is negligent because he inadvertently increases the speed of his vehicle at a time when another vehicle is attempting to pass him. Negligence cannot be predicated upon a mere increase of speed by the driver of an overtaken vehicle unless he has heard a signal or otherwise knows of the intention of another to pass." Clearly, the statute, per se, placed no duty upon the driver of the Matthews truck not to increase the speed of his vehicle until he had been given *an audible signal* from the horn of the Probst car. There being no evidence that any signal was given, the statute plays no part in the decision of this case.

■ Neither was there any evidence, direct or circumstantial, that the driver of the truck checked the speed of the truck in such a manner as to bring him within the meaning of section 304.019, which requires an operator, when checking the speed of his vehicle, if the movement of other vehicles may be reasonably affected by such checking of speed, to extend his arm, etc. LeRoy Probst testified positively that the driver of the truck did not apply his brakes and there was no evidence to the contrary. But, even if the speed of his truck was slowed so as to make the statute applicable, there was no evidence that the driver failed to give such a signal. All of the evidence on that score was that of Pearl Probst, to wit:

"Q. Well, did the truck driver, did he give a signal or anything when you slowed down? A. I don't remember if he did or not."

■ There being no evidence that the driver of the Matthews truck did not comply with the provisions of the statute, it plays no part in the disposition of this case. However, had there been evidence that made the statute applicable, there was yet no showing that the Probst car could have been maneuvered back into its own lane in time to avoid the oncoming Seyer car. Mr. Probst testified that he did not have room to get back into his own lane; that he "figured other cars were awful close to him." Consequently, we conclude that no

submissible case was made against defendant Matthews.

Was a submissible case made against defendant Seyer? For the reasons hereinafter stated, we have concluded there was not.

■■■ The driver of a vehicle traveling in a direction opposite to that of a vehicle passing another is required to exercise lawful care (in this state, the highest degree) to avoid collision even though he may have prior claim to the right of way. Ordinarily, he may assume that the driver of the approaching vehicle will obey the rules of the road and return to his own side of the road. 60 C.J.S. Motor Vehicles § 317, p. 733. When, however, in the exercise of the highest degree of care, it becomes or should become apparent that the driver of the passing vehicle is unable to or will not return to his side of the road in time to avoid danger of collision, it then becomes the duty of the driver of the oncoming vehicle to exercise the highest degree of care to avoid collision by slowing, stopping, swerving or other means reasonably available and consistent with his own safety. Nelms v. Bright, Mo., 299 S.W.2d 483, 489–490, and cases therein cited; 60 C.J.S. Motor Vehicles §§ 317, 319, pp. 732, 738.

■■ The testimony of both Mr. Probst and LeRoy, viewed in the light most favorable to plaintiff, would seem to support a finding that when the Probst car came alongside the truck the Seyer car was seen by them coming around the "big curve" 700 yards to the south, and that the collision between these vehicles occurred at some point on the left (east) shoulder of the highway not exceeding a point 400 yards south of the point where the Probst car struck the left rear dual wheel of the truck. But there was no evidence to show how far the Probst car had advanced down the highway from the time it first undertook to pass the truck until it struck the rear dual wheel of the truck. Absent substantial evidence of that fact, there was no possibility of determining (1) the distance traveled northward by the Seyer car from the "big curve" to the point of its collision with the Probst car, or (2) the distance traveled southward by the Probst car from the point where it first started to pass the truck to the point of its collision with the Seyer car. Mr. Probst testified that he had no idea of that distance. LeRoy's testimony sheds no light whatever upon it. Neither were the estimates of speed made by the witnesses of assistance in that respect. Even if Mr. Probst's estimate of the speed of the Seyer car when he first saw it 700 yards to the south of his car was substantial, there was no evidence whatever that it continued to the point of collision at that rate; and LeRoy's estimate of the speed of the Seyer car was based upon such a fantastically absurd basis as to demonstrate its complete lack of probative value. There was, therefore, nothing in the record from which the jury could determine how far the Seyer car was from the Probst car (1) when and where Seyer, in the exercise of the highest degree of care, saw or should have seen that the Probst car would not or could not return to its proper lane in time to avoid danger of collision; or (2) whether Seyer, traveling at some unknown rate of speed at that instant and point on the highway, could have slowed, swerved or stopped his car in time to avoid collision with the Probst car.

Consequently, there was not sufficient substantial evidence to support a finding either (a) that negligently excessive speed of the Seyer car or (b) that negligent failure of Seyer to reduce the speed of his car was a proximate cause of the collision.

The judgment of the trial court is affirmed.

All concur.