Ronald Joseph NOLTE, a Minor, by Paul Johnson, His Next Friend, Appellant,

v.

Kenneth CHILDRESS, d/b/a Reynolds Gasoline & Chemical Transport Company, and Edward Fred Dixon, Respondents.

No. 50785.

Supreme Court of Missouri,

Division No. 1.

March 8, 1965.

Wendell L. Evans, Jr., and J. W. Grossenheider, Lebanon, for appellant.

Karl W. Blanchard, Seiler, Blanchard & Van Fleet, Joplin, for respondents.

HOUSER, Commissioner.

Action for $25,000 damages for the wrongful death of Harold Nolte, brought by his infant son Ronald Joseph, pro ami, against Kenneth Childress, d/b/a Reynolds. Gasoline & Chemical Transport Company, owner, and Edward Dixon, driver, of a.

tractor-trailer truck which collided with a Chevrolet automobile in which Harold Nolte was riding. The court directed a verdict for defendants at the close of plaintiff's case. Plaintiff has appealed from the judgment rendered on the verdict.

Plaintiff relies on two points for reversal of the judgment: (1) that he made a submissible case of primary negligence based on defendants' failure to stop the truck or to turn the truck to the right onto the shoulder of the highway; (2) that he made a submissible case under the humanitarian doctrine based on defendants' failure to stop or swerve.

This was a collision between a westbound Chevrolet passenger automobile and an eastbound gasoline truck carrying a load of gasoline. The Chevrolet was titled in the name of Harold Nolte's wife, but was being paid for by Nolte. It carried Harold Nolte and one Manuel Barquero. Dixon, who was operating the truck for and on behalf of defendant Childress, was carrying no passengers. The collision occurred at 8:15 a. m. on January 18, 1961 on Highway 66 in Lawrence County about 6 miles west of Halltown. At that point Highway 66 runs approximately east and west. The events leading up to this casualty occurred on an incline or hill which crests on the east and runs down to its low point on the west. The highway consisted of two 9-foot lanes of pavement. On the south side of the pavement there was a 13-foot shoulder made of clay and rock. The shoulder was dry and could be used by traffic. The pavement was dry. Visibility was good.

The truck driver, defendant Dixon, the only survivor of the crash and apparently the only available witness, called to the stand by plaintiff, testified to the following set of facts: Driving the truck east in his right-hand or eastbound lane at a speed of 45 to 55 m. p. h., Dixon reached the bottom of the "ravine" and started up the hill. Approaching him from the east and coming down the hill in their right-hand or westbound lane were two vehicles, a

pickup truck in the lead followed by an automobile. These vehicles were traveling at a speed of 40 to 50 m. p. h. Dixon first saw the Chevrolet approaching from the east as it came over the crest of the hill, a distance of 400 to 450 feet east of his truck. The Chevrolet was then proceeding at a speed of 60 to 75 m. p. h. in its left-hand or eastbound lane—the same lane Dixon's truck was in. When Dixon first saw the oncoming Chevrolet it was starting to pass the westbound automobile, which was the second of the two other westbound vehicles. The Chevrolet had pulled up about halfway between the rear tires and the back bumper—about halfway up the side of that automobile. There was no other traffic in the eastbound lane. The south shoulder was clear —there were no cars parked along the shoulder. The brakes, horn and steering mechanism of the tractor, and the brakes of the trailer, were in good operating condition. Considering the load on the truck, its speed, the grade and all other factors Dixon in an emergency could have brought the tractor-trailer unit to a complete stop within a distance of 170 to 175 feet after he got his foot on the brake.

When Dixon first saw the Chevrolet he "let off on the fuel" and moved his foot "to the brake" but did not apply the brakes because at that time the Chevrolet swerved and went back into its proper lane of traffic—got "entirely" back into the westbound lane—thus leaving the eastbound lane "entirely" clear. After the Chevrolet swerved back into the westbound lane Dixon did not observe any action on the part of the Chevrolet which indicated any danger. Dixon "went ahead and stepped back down on the fuel, going on." The next thing that Dixon observed indicating danger was the Chevrolet starting to turn on about a 45-degree angle, heading across the center line. He saw the front fender of the Chevrolet swerve to come out across the yellow line when the vehicles were about 20 to 30 feet apart. From the time Dixon first saw the approaching Chevrolet until the impact 3 to 5 seconds elapsed. During that time

Dixon saw the Chevrolet put on its brakes, twist or come back in the Chevrolet's right lane and then come out into Dixon's lane as above described. The truck was then traveling about the same rate of speed it had been traveling. The Chevrolet traveled 200 to 225 feet from the time Dixon first saw it until it twisted back into Dixon's lane. During that interval the truck traveled 100 to 175 feet. When the Chevrolet came back out into his lane Dixon immediately "flipped the switch" to set the brakes on the trailer and stepped on the truck brakes. He did not have time to do anything else. Dixon's testimony on whether he swerved to the right was contradictory. Apparently he did not swerve because his left wheels were 6 inches from the center line at the time of impact. After the brakes were applied the truck and Chevrolet collided in the eastbound lane of traffic. The right front fender of the tractor hit the left front fender of the Chevrolet. The truck traveled some 40 feet east, pushing the Chevrolet ahead of it, all four wheels of the truck sliding. Dixon had been watching the Chevrolet at all times after he first saw it. At the time of impact the other two westbound vehicles were passing the truck on Dixon's left. Barquero was found dead behind the steering wheel of the Chevrolet. Mr. Nolte died as he was being loaded into the ambulance. Nolte had left his home 50 miles north of Chicago the previous evening, driving by himself, headed for California. Mrs. Nolte did not know Barquero or where or why he got in the Chevrolet.

Did plaintiff make a submissible case of primary negligence based on defendant's failure to stop the truck or turn onto the shoulder?

Plaintiff's theory as to negligent failure to stop is that when Dixon, traveling at 45–55 m. p. h., first saw the Chevrolet in Dixon's lane 400–450 feet away from him traveling 60–75 m. p. h., attempting to pass an automobile following a pickup truck traveling 40–50 m. p. h., Dixon had a duty to apply the brakes and refrain from accelerating and proceeding because, by the

exercise of the highest degree of care, Dixon could reasonably have foreseen that in slowing down the Chevrolet sufficiently to let the automobile go ahead and in getting back into the westbound lane the Chevrolet "could not get back into its own lane of travel and stay there in the next three or four seconds and thereby avoid a head-on collision with Dixon's truck."

Plaintiff further theorizes that Dixon's failure to turn onto the shoulder was negligence, and that both questions are fact questions which should have been submitted to a jury.

The difficulty with plaintiff's theory on failure to stop is that there is no evidence to support it. There is no evidence of any abnormal, erratic or irregular movements or actions of the Chevrolet, or conduct on the part of its driver, either before or after it fell in behind the other westbound automobile, indicative of its inability to stay in the westbound lane, once there, or which would be reasonably calculated to put Dixon on notice or impose upon him the duty to anticipate that the Chevrolet would or could not stay in the westbound lane. There is no evidence that the Chevrolet was rocking back and forth or careening from side to side or that it was otherwise out of control so as to be liable to return to the eastbound lane. The only evidence on the point is that the Chevrolet got entirely back into the westbound lane, leaving the eastbound lane clear, and that although Dixon was watching the Chevrolet at all times it was not until the vehicles were 20 to 30 feet apart—too late to do anything—that Dixon observed any action which indicated danger. Disregarding the evidence that Dixon observed no action indicating danger as evidence favorable to defendants, and unfavorable to plaintiff, there is still no evidence upon which plaintiff can rely to substantiate his theory of negligent failure to stop. From the evidence of high speed, without more, we may not jump to the conclusion that the Chevrolet was out of control and liable to swing back into Dixon's path. That the Chevro-

let could not get back into its own lane of travel and stay there until defendants' truck passed may not be inferred from and does not reasonably follow from the facts in evidence. To reach the conclusion suggested by plaintiff a jury would be obliged to engage in speculation, guess and conjecture.

It may be (although not supported by evidence), that if, when the vehicles were 425 to 450 feet apart, Dixon had come to a complete stop within 175 feet, or had turned right onto the shoulder, there would have been no collision, but under the facts in evidence there was no obligation upon Dixon to stop or turn aside at that point when the vehicles were 425 to 450 feet apart. "The driver of a vehicle traveling in a direction opposite to that of a vehicle passing another is required to exercise lawful care (in this state, the highest degree) to avoid collision even though he may have prior claim to the right of way. Ordinarily, he may assume that the driver of the approaching vehicle will obey the rules of the road and return to his own side of the road. 60 C.J.S. Motor Vehicles § 317, p. 733. When, however, in the exercise of the highest degree of care, it becomes or should become apparent that the driver of the passing vehicle is unable to or will not return to his side of the road in time to avoid danger of collision, it then becomes the duty of the driver of the oncoming vehicle to exercise the highest degree of care to avoid collision by slowing, stopping, swerving or other means reasonably available and consistent with his own safety. Nelms v. Bright, Mo., 299 S.W.2d 483, 489–490, and cases therein cited; 60 C.J.S. Motor Vehicles §§ 317, 319, pp. 732, 738." Probst v. Seyer, Mo.Sup., 353 S.W.2d 798, 804 [7, 8], 91 A.L.R.2d 1252. The corollary to this rule is that where the oncoming passing vehicle returns to his side of the road and thereby eliminates the danger of collision there is no duty on the part of the approaching vehicle to take preventive measures unless and until it becomes apparent or should become apparent, in the exercise of the highest degree of care, that another danger of collision has arisen. Dixon was required only to act upon reasonable appearances. When he saw the Chevrolet approaching on its wrong side of the road he had a right to assume that its driver would obey the rules of the road and return to the proper side of the highway. Nevertheless Dixon moved his foot to the brake and was ready to apply the brakes. Then the Chevrolet returned to its proper lane. The danger of collision in the normal course of events having passed, Dixon was entitled to proceed forward normally until in the exercise of the highest degree of care it became or should have become apparent to Dixon that the oncoming Chevrolet was unable to or would not keep to its side of the highway. This did not become apparent until it was too late to take preventive measures. To require Dixon to have stopped or run off the highway onto the shoulder when the vehicles were 400 to 450 feet apart or after the Chevrolet returned to the westbound lane, under these facts, would be to set up an impractical, unrealistic and unreasonable requirement.

The cases cited by plaintiff, Swain v. Anders, 235 Mo.App. 125, 140 S.W.2d 730; Stanton v. Jones, 332 Mo. 631, 59 S.W.2d 648; Prince v. Bennett, Mo.Sup., 322 S.W.2d 886; Karch v. Stewart, Mo.Sup., 315 S.W.2d 131, present factual situations so essentially different from that under review that they do not persuade us to reach any different conclusion. In none of them did plaintiff's automobile swerve from the wrong lane back into the right lane, remain in the right lane for a time, and then swerve into the wrong lane instantly before the collision. In none of them was the point raised that defendant should have foreseen that plaintiff's automobile could not get back into its proper lane *and stay there*.

Plaintiff did not make a submissible case of primary negligence based upon failure to stop or failure to turn onto the shoulder.

574

Did plaintiff make a submissible case under the humanitarian doctrine, based on defendants' failure to stop or swerve?

Plaintiff's theory is that plaintiff's decedent was in a position of imminent peril from the moment Dixon first saw the Chevrolet, that is, when the vehicles were 450 feet apart; that at that time Dixon should have recognized the peril and should have known that the Chevrolet would "likely" be unable to return to its own lane of traffic in the next 3 to 5 seconds; that the Chevrolet traveled only 190 feet thereafter until it was struck, whereas the truck traveled 260 feet, within which Dixon could have stopped in 170 to 175 feet or swerved to the right onto the shoulder and thereby have avoided the collision, but that he failed to do so.

■■ The basic requirement under the humanitarian rule is that plaintiff be in a position of imminent peril. The difficulty with plaintiff's theory is that plaintiff's decedent was not in a position of imminent peril at the time plaintiff claims, i. e., at the time the two vehicles were 400 to 450 feet apart. While it is true that at that time they were headed toward each other in the same traffic lane and that they were momentarily bent on a collision course, it is also true that they were then so far apart that the danger of collision was not certain, immediately impending, and admitting of no time for deliberation before the impending calamity. That the danger of collision on that course was contingent and uncertain, remote and avoidable is made manifest and conclusively demonstrated by the conceded fact that the driver of the Chevrolet thereafter slowed down and moved from the eastbound into the westbound lane behind the westbound automobile. In that position there was no danger of collision in the eastbound lane. The driver of the Chevrolet had time to accomplish these things while the two vehicles were still separated by several seconds in time and a considerable distance in feet. As urged by defendants,

"the appearance of peril dissipated" when the Chevrolet slowed and returned to its side of the highway. There is no evidence to support any theory that might be advanced that plaintiff's decedent was in a position of imminent peril at any time after the Chevrolet returned to the westbound lane and before it commenced to turn at a 45-degree angle across the center line into the eastbound lane . . . no evidence that during this time the Chevrolet was skidding, sliding, careening, weaving back and forth, or otherwise giving any appearance of being out of control, or indicating that it might momentarily return to the eastbound lane. It was not until the Chevrolet commenced to cross the center line—when the two vehicles were only 20 or 30 feet apart, traveling at a combined speed approximating 90 miles an hour—that plaintiff's decedent came into a position of imminent peril. Another constitutive element of a claim under the humanitarian rule is that the defendant have the present ability with the means at hand to avert the impending injury. West v. St. Louis-San Francisco Ry. Co., Mo.Sup., 295 S.W.2d 48, 52 [5]. Concededly it was then too late for effective preventive measures on Dixon's part. Plaintiff does not contend that Dixon could then have avoided the fatal collision.

■ Plaintiff did not make a submissible case under the humanitarian doctrine.

The court properly directed a verdict for defendants. The judgment should be affirmed and it is so ordered.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HYDE, P. J., and HOLMAN and FINCH, JJ., concur.