Stephen R. **ALLAN**, a Minor by Next Friend and Mother Lillian R. Allan, Plaintiff-Respondent,

v.

Jack Victor **READ**, Defendant,

and

John Bradley Davis, Defendant-Appellant.

No. 24876.

Kansas City Court of Appeals.

Missouri.

Oct. 7, 1968.

Harold T. VanDyke, Jerry R. Linscott, Kansas City, Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel, for appellant, John Bradley Davis.

Paul H. Niewald, Gordon, Adams, Niewald & Risjord, Kansas City, for respondent, Stephen R. Allan.

CROSS, Judge.

Plaintiff was injured in a two car head-on collision. He sued both drivers, namely, defendant Davis, in whose car he was riding as a passenger, and the defendant Read, driver of the other car. Trial to a jury resulted in a verdict and judgment for $8,500.00 in favor of plaintiff and against both defendants. Only defendant Davis has appealed.

■ The case was submitted to the jury, as against defendant Davis, on the theory that the two vehicles approached each other on a collision course, that Davis knew or by using the highest degree of care could have known there was reasonable likelihood of collision in time to have swerved and avoided the collision, but that he negligently failed to do so. This issue was submitted by Instruction No. 5 in form essentially as prescribed by MAI 17.04. As appellant, Davis now contends there was insufficient evidence to support that submission and that the trial court consequently erred in denying his motion for a directed verdict at the close of all the evidence. In resolving these questions it is our duty to view the evidence in the light most favorable to plaintiff and give plaintiff the benefit of all favorable inferences to be drawn from the evidence. Accordingly, we proceed to state the facts we consider pertinent to our decision.

The collision occurred shortly after midnight, June 2nd, 1965, on U. S. Highway 69, approximately eleven miles south of Cameron. The Davis car approached the point of impact traveling from the north, headed south,—defendant Read's car from the south, headed north. At the time of the collision plaintiff was asleep as a passenger in the Davis car and remembers nothing about the occurrence. Highway Patrolman LeRoy Soperla, called to investigate the accident, arrived at the scene soon after it happened. He testified: In the vicinity of the accident, U. S. Highway 69 has two traffic lanes—one for northbound travel and one for southbound. The highway is 20 feet wide and has shoulders on each side, described as fairly wide, level normal

shoulders with a small amount of grass on them. The east shoulder is eight feet wide —the west shoulder nine feet. On the night in question the weather was cloudy, but not raining, and the pavement and shoulders were dry. Upon the officer's arrival he found the Davis car (a '62 Plymouth) positioned "more or less sideways" in the southbound lane with the nose pointed toward the center of the highway. The Read car (a '50 Rambler station wagon) was facing north "astraddle" of the center line, sitting approximately in the middle of the highway, with its left wheels in the southbound lane. The officer found debris (mostly broken glass, chrome, dust and dirt) extending in heaviest concentration from the center line into the west or southbound lane for approximately three feet. From the point where he found the vehicles and debris, the roadway extends uphill to the north for 360 feet to a crest. "Looking to the south" from the same point the roadway extends approximately 200 feet to the bottom of the hill where it "starts an incline back up" for a considerable distance estimated at six or seven hundred feet. The highway is straight and not curved as it extends both north and south from the place mentioned. There were skidmarks behind the Davis car. The left wheels left marks 67 feet long but the right wheel marks were only 34 feet long. The left front wheel mark started one foot west of the highway center (as the Davis car traveled south) extended to and ended at the center line, thereby indicating that the left front brake took effect first, causing the car to veer slightly to the left or toward the center of the highway. "From where the skidmarks started with the left wheel they went from possibly one foot over to the centerline." The overhang of the body of the Davis car extended approximately six to eight inches beyond the wheels. The wheelbase of the Davis automobile was approximately 10 feet.

Defendant Read testified that prior to and at the time of the collision he was traveling between 50 and 55 miles per hour. He said the last he could recall before the accident was that he was on the right side of the highway, but he was unable to state what position the cars were in with reference to the center line on the highway at the time they collided. It was his best judgment that the left front of his car came into collision with the left half of the Davis automobile and that the width of an automobile would be about six feet. He did not recall seeing the Davis car when it came over the hill from the north some 600 feet distant and he claims that the first and only time he was aware of the Davis car was when he saw its headlights when it was approximately three car lengths in front of him. He did not reduce his speed before the collision occurred, he couldn't remember whether he applied his brakes, but he stated that he jerked his wheel to the right when he saw the Davis car's headlights in front of him. Whether this had any effect in changing the vehicle's direction he was unable to say. He admits there is a period of time he can't account for just before he saw the headlights on the Davis car.

Appellant Davis testified to facts in substance as follows: He had been traveling south on Highway 69 at a speed of 60 miles per hour prior to the accident and was traveling at the same speed when he came over the crest of the hill on which the accident occurred. When he crested the hill and his lights came down he saw the headlights of the Read car in front of him. This was the first time he saw the other car and at that time "those headlights" were in his lane of traffic. That was when he "came off of the little crest" and his headlights came down. He admitted that he didn't need his own headlights to see the headlights of the "other car" and that "you can see headlights whether your headlights are even on as they are approaching from the opposite direction." Appellant's testimony is contradictory as to when he applied his brakes. At the trial he testified that when he saw Read's headlights in front of him "I hit the brakes and that is all I remember." In depositional answer read to the jury he said he didn't

know whether he drove "down the road some distance" before he applied his brakes. Davis admitted that he never swerved his car "to the right or to the left."

Mrs. Lorine Morrow, called as a witness by appellant, testified that she recalled traveling southward on Highway 69 "for quite a while" behind the Davis automobile, at a speed "around 60". Just before the accident occurred, she saw the lights of the Davis car disappear over "the hill". Apparently the collision occurred before she got over the hill. She stated that she made a fast brake application and stopped her car before reaching the vehicles involved. Mrs. Morrow's testimony was corroborated by her daughter Elizabeth who was riding as a passenger.

It is contended by appellant that there is no evidence to establish certain critical factors of time, distance and location of the two vehicles involved, without which a jury verdict against appellant could be returned only (so appellant argues) by speculation and conjecture. Appellant specifically claims there is no evidence to show that he could have seen the Read automobile from the crest of the hill; to show at what point north of the point of impact appellant could or should have seen Read's automobile; to show how many feet south of the point of impact Read's automobile was when appellant saw it, or, to show that appellant had sufficient time or distance in which to swerve his car and avoid the collision after he saw or could have seen there was a reasonable likelihood of collision. These contentions are not consistent with the record.

The testimony of Davis himself afforded the jury a sufficient evidentiary basis from which they could determine, with reasonable accuracy, the time when and the place where he first saw the Read automobile. Answering the question, "And tell the jury what was the first thing that you saw after you came over the hill and started down the hill?" Davis stated (in part) that "after I came over the hill and as my lights came down, I saw these headlights in front of me." It is readily calculable that Davis was at that time approximately 350 feet from the point of impact, since it was established by Soperla's testimony that the crest of the hill was 360 feet north, and it is a reasonable assumption that the Davis car lights "came down" when the rear wheels of the vehicle rested on the hill crest and the front wheels were on the downward slope beyond.

By simple computation it would have been apparent to the jury that Davis, traveling at 60 miles per hour (88 feet per second) would have covered the distance of 350 feet and reached the point of collision in approximately 4 seconds after his first view of the Read automobile. Further calculation would have revealed that during the same elapsed time of 4 seconds Read, traveling at the speed of 50 miles per hour (73.16 feet per second) would have driven his car a total distance of approximately 291 feet to the point of collision. Thus, there was evidence from which the jury could find that the two vehicles were separated by approximately 641 feet in point of distance and 4 seconds in point of time when Davis first saw the headlights of Read's car traveling toward him in the wrong lane. Allowing 3⁄4 seconds for reaction time, it was permissible for the jury to believe that thereafter Davis had approximately 3¼ seconds and 284 feet in which he could have taken such measures to avoid collision as may have been available and legally incumbent upon him to exercise under the circumstances existing.

Ordinarily a motorist in the exercise of the highest degree of care need not slow down, stop, or swerve from his course merely because he sees another car approaching on his side of the road. However, when it becomes known to him, or by the exercise of the highest degree of care he should know that the driver of the car approaching toward him on the wrong side of the road is unable to or will not return to his side of the road in time to avoid danger of collision, it then

becomes the motorist's duty to exercise the highest degree of care to avoid the impending collision by slowing, stopping, swerving, or other means reasonably available and consistent with his own safety. Nelms v. Bright, Mo.Sup., 299 S.W.2d 483; McGuire v. Steel Transportation Company, Inc., 359 Mo. 1179, 225 S.W.2d 699; Nolte v. Childress, Mo.Sup., 387 S.W. 2d 569. The question as to when and where a motorist in the exercise of the highest degree of care knows or should know that the driver of an automobile encroaching on the wrong side of the highway could or would not return to his own side is for determination by the jury. Moore v. Middlewest Freightways, Mo.Sup., 266 S.W.2d 578. As previously stated, there was evidence before the jury from which they could find that Davis saw the Read vehicle when it was 641 feet distant, that it was then traveling in the wrong lane and so continued to the point of impact, and that Davis was continuously in the direct path of the Read car from the time he first saw it until the two cars collided. The foregoing adequately supports the jury's conclusion that Davis knew or should have known that Read would not return to his own side of the road, in time to have averted the collision by swerving his own vehicle.

We find no merit in appellant's suggestion that he did not have sufficient time or distance in which to swerve his vehicle and that there is no showing he could have done so with safety to himself. Considering the evidence in the light most favorable to plaintiff, it may be inferred that prior to the brake application by Davis 67 feet north of the point of impact, Davis had been traveling with his left wheels approximately one foot west of the center line. It is shown by the trooper's testimony that after Davis applied his brakes his car moved toward the center line, that when the impact occurred the left front wheel was at the center line, and that an additional 6 to 8 inches of body overhang extended farther eastward into the northbound lane. The impact of the Read car

was against the left half of the Davis car, which portion, according to the evidence, would have measured three feet. Therefore, the jury was justified in believing that by timely swerving his car to the right approximately two feet, Davis could have avoided the collision, that there was sufficient room on the paved portion of the highway on which he could have made such movement, and that additionally available was the nine foot space afforded by the level, normal and dry shoulder. We decline to rule as a matter of law that Davis could not have safely executed such evasive action within the net time and distance available to him, which the jury reasonably could have found to be approximately 3¼ seconds and 284 feet. See Morris v. Alexander, Mo.App., 275 S.W. 2d 373 and Anderson v. Bell, Mo.Sup., 303 S.W.2d 93.

Appellant cites and relies upon Probst v. Seyer, Mo.Sup., 353 S.W.2d 798, Moore v. Middlewest Freightways, Inc., Mo.Sup., 266 S.W.2d 578, Nolte v. Childress, Mo. Sup., 387 S.W.2d 569, Wilson v. Toliver, Mo.Sup., 305 S.W.2d 423 and Simmons v. Shomer, Mo.App., 395 S.W.2d 507. Those cases are factually distinguishable from the case presently considered and do not militate against the conclusions we have reached. In the Probst case there was no substantial evidence from which the jury could determine how far either of two colliding automobiles traveled to the point of impact after the danger of collision was discoverable or the rate of speed at which the vehicles approached the point of collision. The above cited Moore case is favorable to plaintiff on the issues presently involved. The facts there were that plaintiff truck driver first saw defendant's truck in the wrong lane of traffic when the two trucks were within 10 to 20 feet of each other, at which time plaintiff ineffectually attempted to move his truck out of the path of defendant's truck. Plaintiff had a jury verdict and judgment and defendant appealed. Declining to rule that plaintiff was guilty of contributory negligence as a matter of law, the Supreme

Court held that "The question as to when and where plaintiff, in the exercise of the highest degree of care for his own safety, should have known that defendant's driver could not or would not return its truck to its own side was peculiarly a question for the jury." In Nolte v. Childress, the danger presented did not arise until the two colliding vehicles were 25–30 feet apart, at which time the car in which plaintiff was riding swerved out of its lane into the lane in which defendant was approaching. Under those facts (which are grossly dissimilar to the facts in the instant case) the Supreme Court held that plaintiff did not make a submissible case of primary negligence based on defendant's failure to stop or swerve to the shoulder. Wilson v. Tolliver involved humanitarian submissions under circumstances far less favorable to the possibility of evasive action by the motorist charged with such duty than is shown by the evidence in this case. The Simmons case was submitted against one of the defendants (Jones) on humanitarian negligence charging him with failure to dim his headlights and to slacken speed or turn aside; also upon primary negligence in driving with his headlights on high beam. The jury found in favor of defendant Jones and the trial court granted plaintiff a new trial. On appeal the court held that no submissible case was made against Jones on either theory, in view of evidence that the defendant Jones had only "a little over 1.5 seconds, of which three quarters of a second was consumed by Mr. Jones' reaction time" in which to act after discovering the peril involved.

We affirmatively rule that the trial court did not err in denying defendant Davis's motion for a directed verdict at the close of all the evidence or in submitting the case under plaintiff's verdict directing Instruction No. 5.

Appellant undertakes to present additional complaints of error directed against the form and phraseology of Instruction No. 5 which are not properly before us. No allegations of the errors now claimed were presented to the trial court by a motion for a new trial or otherwise as required by Civil Rule 79.03, V.A.M.R., in order to preserve the questions for appellate review. The matters of complaint are not within the scope of review provided for by Civil Rule 79.04.

The judgment is affirmed.

All concur.