STATE of Missouri upon the relation and to the use of Earl WILLIAMS and Pauline Williams, and Earl Williams and Pauline Williams, Plaintiffs - Respondents - Appellants,

v.

FELD CHEVROLET, INC., a Corporation, Defendant-Appellant-Respondent.

Nos. 31861, 31862.

St. Louis Court of Appeals.

Missouri.

May 17, 1966.

George F. Kosta, Morris E. Stokes, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for Earl Williams and Pauline Williams.

Norman Bierman, Stuart M. Haw, Jr., Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for Feld Chevrolet, Inc.

RUDDY, Judge.

Plaintiffs brought this action in six counts against Louis G. Berra, Constable of the Magistrate Court of the City of St. Louis; Maryland Casualty Company, as surety for said Louis G. Berra; M & M Auto Road Service, Inc.; Walter E. Reitman, doing business as Reitman Auto Painting Company and Feld Chevrolet, Inc., to recover damages for the loss of their 1956 Bel Air Chevrolet automobile and its contents. During the trial plaintiffs dismissed their action against the first three named defendants. The jury returned a verdict in favor of plaintiffs and against defendant Feld Chevrolet, Inc., in the sum of $1400 and in favor of defendant Walter E. Reitman. The trial court sustained the motion of defendant Feld Chevrolet, Inc., for a new trial on the issue of liability only but denied its motion for judgment in accordance with its motion for a directed verdict. Plaintiffs' motion for a new trial as to Count II of their petition was denied. Plaintiffs appealed from the order of the court sustaining the motion of defendant Feld Chevrolet, Inc., for a new trial on the issue of liability only and from the denial of their motion for a new trial as to Count II of their petition. Defendant Feld Chevrolet, Inc., appealed from the action of the court denying its motion for judgment in accordance with its motion for a directed verdict. The only parties involved in these appeals are the plaintiffs and the defendant, Feld Chevrolet, Inc. Plaintiffs contend they made a submissible case of conversion under Count II of their petition and that the trial court erred in refusing to instruct on that issue. Defendant contends plaintiffs did not make a submissible case of conversion and did not make a case on the theory submitted, namely, specific negligence. A determination of these contentions requires a narration of all the pertinent evidence.

On December 20, 1957, defendant obtained a judgment against the plaintiffs in the amount of $188.88 and costs in the Magistrate Court of the City of St. Louis, Missouri. It is admitted by plaintiffs that the judgment was not satisfied and that nothing had ever been paid on said judgment. It is admitted that on October 22, 1958, a levy under an execution, based on the aforesaid judgment in the Magistrate Court, was legally and lawfully issued. It is the happenings that took place during and following the enforcement of this execution that form the basis of plaintiffs' cause of action.

Plaintiffs were the owners of a 1956 Bel Air Chevrolet automobile and on January 16, 1959, this automobile was parked on the street in front of their apartment at 4957 Washington Avenue, in the City of St. Louis. On the aforesaid date, around 8:15 A.M., Stuart M. Haw, Jr., attorney for defendant, went to 4957 Washington Avenue in the hope of finding plaintiffs' automobile. Finding the automobile parked on the street, he called Bert L. O'Brien, who was a Deputy Constable of the Magistrate Court (hereinafter referred to as the Constable) and who was called as a witness by

plaintiffs. After a while the Constable arrived and thereafter the Constable notified the Police Department that he was about to take the aforesaid automobile under the execution which he had. Shortly after calling the Police Department a policeman arrived and the Constable, in the company of the policeman, knocked on the door of plaintiffs' apartment and rang the door bell but received no response. The Constable left a copy of the execution papers, together with a note in his own handwriting, stating where the automobile was to be taken, in what he thought to be the mailbox for the apartment of the plaintiffs. The automobile was seized by the Constable under the execution to satisfy the judgment and taken into custody and possession by him. The Constable told Mr. Haw, the attorney, to make arrangements for the towing of the automobile. Thereupon, Mr. Haw telephoned the M & M Auto Road Service, Inc., for a truck to tow the car. Upon arrival of the tow truck, the operator thereof "forced back" the left front window "just enough to get that [a] coat hanger down there to pull up the latch" and opened the door of the automobile. Because the car was locked the Constable instructed the driver of the tow truck to break the ventilator window so as to get into the car. In explaining how he and the driver gained entry into the car, he said "we just bludgeoned it" enough to open the door. The ventilator window opened and closed by means of a crank. He said the glass in the window was broken, later stating it was cracked. The Constable stated that his office had no garage or other place to store the automobile and he asked Mr. Haw where he wanted the car to be stored. Mr. Haw told him it could be taken to the used car lot of the defendant at the corner of Manchester and McCausland Avenues in the City of St. Louis. After receiving a note from Mr. Haw showing the address of the used car lot of the defendant, the Constable directed the driver of the tow truck to take the car to the aforementioned used car lot. He said he had the car taken there because he had orders that it was to be stored for thirty days. Through

some misunderstanding the operator of the tow truck took the automobile to a lot operated by defendant in Maplewood, Missouri, and upon arrival there was instructed to take the car to the used car lot of defendant at Manchester and McCausland Avenues, which he did.

The afternoon of January 16, 1959, the day the car was taken, the Constable drove to the used car lot at Manchester and McCausland Avenues and saw the automobile. On this occasion he saw no key in the ignition and said the license plate was on the car. He saw two signs on the lot, one facing McCausland Avenue and one on Manchester Avenue, apparently indicating it was a used car lot. He did not check the doors of the car to see if they were locked, nor did he inspect the left ventilator window. There was a small building on the used car lot in which he said there was a desk and a telephone. He had no conversation with, nor did he give any instructions to, any employee of the defendant relative to the care of the automobile. He did not authorize the making of a key to fit the ignition and no one asked him for authority to make such a key. He did not place anything on the car indicating it was property in the custody of the law. At no time did he look into the trunk of the automobile and, therefore, made no inventory as to its contents. The Constable never saw the automobile again and had no further dealings relative to it until he received a letter on March 6, 1959, from Mr. Haw informing him the automobile had been stolen.

The plaintiffs testified they were the owners of the automobile in question and that on the morning of January 16, 1959, they found their automobile was missing and was not in the place it had been parked by Mr. Williams, one of the plaintiffs. Neither plaintiff has seen the car again since it was parked by Mr. Williams on the 15th of January, 1959. Neither of the plaintiffs had given permission or consent to any person to remove the automobile from the place where it had been parked and they had not been notified by anyone

concerning the proposed movement of the car away from the place where it had been parked.

Plaintiffs in their testimony described the personal property which they said was in the trunk of the automobile at the time it was taken into custody by the Constable. Mr. Williams in his testimony said that he did not inform or write any letter to anyone at defendant's office about the personal property he said was in the trunk of the automobile at the time it was taken. Mrs. Williams testified that on January 30, 1959, she wrote a letter to defendant, addressed to Mr. Wilson, evidently inquiring about the automobile and admitted that she made no mention in the letter of any personal property being in the trunk of the automobile. Plaintiffs said they made a claim for a loss by theft of their automobile against their insurance carrier and received a check for a theft loss in the amount of $1250 payable to themselves and the Universal Match Credit Union. Plaintiffs through their attorneys stated to the court that they had no actual personal knowledge of the theft of the car but that they did not contest the contention of the defendant that the automobile was stolen from the Reitman premises, which theft will be more fully discussed hereinafter.

On cross-examination, Mrs. Williams admitted that plaintiffs received a letter from the law firm representing the defendant in which plaintiffs were told that their automobile had been seized by the Constable of the City of St. Louis pursuant to an execution issued to collect a judgment against plaintiffs in favor of the defendant. Mr. Williams testified he never did find the execution and the note that the Constable said was left in the mailbox. However, he said he learned from the Police Department on the day the car was taken that it had been picked up by the Constable and was told where it had been taken.

Walter Reitman was called as a witness by plaintiffs and testified that he conducted an auto body and painting shop at 2204 Forest Avenue in the City of St. Louis, Missouri, and that his business was known as the Reitman Auto Painting Company. He was not connected with or employed by defendant. He conducts his business in a one-story concrete building on the east side of the street, the west wall of which is about six feet from the public sidewalk. On the west side of the building was an entrance with an overhead door through which vehicles may be driven into the building, and there was a smaller door at the rear of the building where vehicles could be driven out onto a cinder lot. This lot was to the rear of the building and was not paved but was composed of dirt and cinders. From this lot one could drive northward approximately 75 or 100 feet onto Bruno Avenue. On reaching Bruno Avenue a left turn would be made in order to reach Forest Avenue. Bruno Avenue at the point where one would emerge from the lot is a dead-end street immediately east thereof. This area to the rear of Reitman's building is not fenced or enclosed and is readily accessible to persons in the vicinity. On the south end of the front wall of the building there is a small door that leads into a small office. Reitman knew that defendant had a used car lot at Manchester and McCausland Avenues, which was a distance of one block from his business property. He was well acquainted with Mr. Maguire and Mr. Sherman who operated the used car lot for defendant. He said he dealt with them "practically every day." On January 16, 1959, one of these two men called Reitman about the Williams' car and told him that the defendant wanted "to get it off the lot a day or two." He asked the caller whether or not he could put the car in the back of his premises and he was told that they did not care just where he placed it. Reitman testified, "then the porter came up and parked it in back. That's the last I know of it, other than being there." He said that inasmuch as he had no work to perform on the car, he was not interested in its description. He knew it was the porter who delivered the car be-

cause this porter had previously brought cars to and taken cars from his building. He had no conversation with the porter at the time the car arrived. The car was placed on his premises at the rear of the building in which he operated his business. When Reitman was asked if a key was delivered with this automobile, he answered, "That I can't remember. We have a practice when there is cars—we have too many to put in the shop, the older ones then we may lock up in the back and bring the key in, but this particular case we had no reason to move the car, we had nothing to do with it, so if there was a key this same fellow that delivered it may have thrown it on the desk, but I never put them up with the surplus sets of keys, best way I can explain it. I don't remember anything about a set of keys." He was never told who owned the car and said he had "nothing to do with" the automobile. He was promised no pay and received no pay for letting defendant put the car on his premises. Reitman said the car was never on the inside of his building and that it had been on the lot to the rear of his building for approximately three weeks before it was found to be missing. Thinking the defendant got the car, he called down to "either Maguire or Sherman * * * and asked him if they got the car, and they said, 'No.'" He then told the person he was talking to that the car was no longer on the rear lot. He said in order to gain access to the rear lot where the car was placed, you had to go through the doors of his building or go around the block or go through one of the adjoining businesses.

Reitman remembered talking to Lewis R. Corbet, who was the Finance Manager of defendant, but he was not sure when he first talked to him. He thought Mr. Haw's face looked familiar to him. He had a "faint recollection" that Corbet came to his place of business and was there about two or three minutes and left. This was after the car was missing. He did not remember that a police officer was with Corbet. He did not remember Corbet telling him that

the automobile was levied or executed on by the Constable. He recalled no such conversation. He did not remember the license plate or the key to the automobile being in his office and said: "I said the fellow brought it up could have thrown it in the office; he brought cars up before and throwed it in the office. The car was not touched. I couldn't tell you the contents or couldn't tell you nothing about it."

Lewis R. Corbet was called as a witness by plaintiff and testified that at the time of the occurrence in question he was the Finance Manager for the defendant company. On January 16, 1959, he saw the 1956 Bel Air Chevrolet owned by plaintiffs on the used car lot at Manchester and McCausland Avenues. He had an ignition key made for the automobile in defendant's shop so that it could be moved without the necessity of being towed each time. He said there was only one key made at the time and that there would be no occasion to make more. He said Maguire and Sherman were the co-operators of defendant's used car lot, describing it as a small lot limited to 15 or 16 cars with a small former filling station building on the lot. He gave the ignition key to Maguire. He said the key was attached to a little metal disk with a cardboard insert on which he thought he wrote "Earl Williams '56 Chevrolet." He said the last time he saw the key "it was on Mr. Reitman's keyboard," which was on the day the car was stolen, when he visited Reitman's place with a police officer. This occurred approximately three weeks after he first saw the car on January 16, 1959, on the used car lot. On January 16, 1959, he inspected the car and thought he had examined the contents of the car. He told Maguire that he wanted the car placed in storage some place and asked Maguire to suggest a place. He said Maguire suggested Reitman's and that Maguire made the arrangements with Reitman for storage of the car. Either that day or the next day he visited Reitman's place of business and had a conversation with Reitman concerning ownership of the automobile. He

thought the car was in Reitman's shop when he saw it but of this he was not certain. He did not tell Reitman where on his premises to place the car. He told Reitman the circumstances surrounding the car and said that he did not lead Reitman to believe that the car belonged to the defendant company. He did let him know the car was under a court order. He said that neither he nor anyone at his direction notified the Constable's office about the removal of the car to Reitman's premises or about the making of the key to fit the automobile. Corbet had never been to Reitman's place of business before and had no knowledge of the physical layout of the premises. However, he knew that Reitman had done auto body painting and other work for the defendant company. He said he ordered the car moved to Reitman's place for safekeeping and so as to separate it from the cars that were on the used car lot for sale. He had never heard of an automobile being stolen from Reitman's place and to his knowledge Reitman had a good reputation. He said, because of this, he believed Reitman would take care of the car and had no reason to believe otherwise.

Corbet reported the theft of the automobile to the Police Department. Thereafter, he met a policeman at Reitman's place of business where Corbet had a conversation with Reitman. While there Corbet saw the license plate of the plaintiffs' automobile in Reitman's office and saw the key on a keyboard. Corbet did not know what disposition was made of the license plate, stating that he had a conversation with Reitman concerning the plate, which took place in the presence of the police officer. Corbet said it was stressed to him and the police officer by those questioned at the time that the car was outside, locked up and that the key and plate were inside the building. He did not know what disposition had been made of the key.

Stuart M. Haw, Jr., called as a witness for defendant, testified in much the same vein as did the Constable, concerning what happened on the morning the car was seized by the Constable. In addition, he testified that he never opened the car, went into it, nor did he touch the car. After the tow truck left Mr. Haw went to the used car lot at Manchester and McCausland Avenues and there saw the car brought in by the tow truck. On April 28, 1960, he visited Reitman's place and talked to him. On that occasion, Reitman told him that the car had been parked behind his building and had been locked and showed him the key to the automobile, stating "here is the key to the automobile and I have been hanging on to it." The key was in the office. Haw told him, "You hang on to it yourself, because if we have to call you to come in to testify you can bring it along and identify it as the key that locked that car, and it has been in your office ever since." Reitman told him the automobile was locked the last time he saw it.

On cross-examination Mr. Haw said that when he last saw the car on the used car lot the left ventilator window was still broken but that it could not be opened readily after it had been locked; however, admitting that he did not try the window. About a week or more after the car was seized by the Constable on January 16, 1959, Haw wrote to the plaintiffs informing them that the car had been taken under a writ of execution to satisfy the judgment. In early March 1959 he wrote a letter to the Constable informing him of the theft of the car.

█ We first take up for consideration the contention of plaintiffs wherein they assert that since defendant secured the relief it sought from the trial court in its motion for new trial, there is no judgment or order against it from which an appeal could be taken. As we have pointed out, defendant appealed from the action of the court denying its motion for judgment in accordance with its motion for directed verdict. In support of its appeal, defendant contends that plaintiffs failed to make a sub-

missible case against it and, therefore, its motion for judgment in accordance with its motion for a directed verdict should have been sustained. This contention of plaintiffs must be sustained and defendant's appeal will be dismissed. However, as said in the case of Schmittzehe v. City of Cape Girardeau, Mo., 327 S.W.2d 918, 1. c. 920:

"* * * the effect of dismissing defendants' appeal is more academic than real. The basis of the purported appeal was that the trial court should have sustained their motion for a directed verdict because plaintiff failed to make a submissible case either under primary or humanitarian negligence. These contentions were preserved in the motion for [a] new trial, and in a situation precisely the same as here this court held that it would upon appeal by plaintiff from an order granting a new trial (after dismissing defendants' appeal from the order denying a motion to set aside the verdict and judgment and enter judgment in accordance with the motion for a directed verdict) examine the evidence to determine whether or not plaintiff made a case for the jury, and if the 'record plainly shows plaintiff under the law and the evidence cannot recover, the parties should be spared the trouble and expense of another trial.' Bailey v. Interstate Airmotive, Inc., supra, [358 Mo. 1121,] 219 S.W.2d [333] at page 336 [,8 A.L.R.2d 710]."

In the instant case the grounds alleged in support of defendant's motion for directed verdict were repeated and preserved in the motion for new trial. Therefore, we will examine the evidence to determine whether or not plaintiffs made a submissible case against the defendant. In further support of our action see Carter v. Matthey Laundry & Dry Cleaning Co., Mo., 350 S.W.2d 786; Emily v. Bayne, Mo.App., 371 S.W.2d 663, and Gill v. Mercantile Trust Company, Mo.App., 347 S.W.2d 420.

As we have heretofore pointed out, one of the points relied on by plaintiffs in their appeal is that the trial court erred in refusing to give their instructions predicated on the theory of conversion pleaded in Count II of their petition and the attendant issue of punitive damages prayed for in their petition.

Plaintiffs contend that the conversion took place when defendant delivered the automobile and key to the Reitman lot, holding that this constituted a delivery of bailed property to one not authorized by the bailor to receive it and, therefore, a conversion of the automobile took place. They say that the act of delivering the automobile to Reitman's lot constituted an exercise of dominion over plaintiffs' property, adverse to their right, and after the purpose of the bailment had been effected. Citing Charles F. Curry and Company v. Hedrick, Mo., 378 S.W.2d 522; E. B. Jones Motor Co. v. Pullen, Mo.App., 298 S.W.2d 448, and Motors Insurance Corporation v. Union Market Garage, Mo.App., 207 S.W.2d 836. All of these cases involved delivery of the bailed property by the owner or possessor to the bailee and the contention that after the purpose of the bailment had been completed the bailee refused or failed to return the bailed property to the bailor. The facts in the cases cited are far different than the factual situation presented in the instant case.

Conversion is an *unauthorized* assumption and exercise of the right of ownership over the personal property of another to the exclusion of the owners' right. Kegan v. Park Bank of St. Joseph, 320 Mo. 623, 8 S.W.2d 858, 1. c. 871; 89 C.J.S. Trover and Conversion, § 1, p. 531. It is a possessory action wherein the owner of the personal property must show that he has either a general or special property in the thing converted and the right to its possession at the time of the alleged conversion. We fail to see that the delivery of the automobile by defendant to the Reitman lot constituted an exercise of dominion over

plaintiffs' automobile by the defendant. It is certain that plaintiffs did not have any right of possession against either the Constable or the defendant at the time of the alleged conversion. What plaintiffs fail to recognize is that the defendant was a mere agent for the Constable. We think it was a vicarious agent of the Constable and assumed the same position and duty with reference to the automobile as did the Constable. In the case of Birmingham v. Carr, 196 Mo.App. 411, 197 S.W. 711, a constable came into possession of a horse he had seized under a writ of attachment. The constable placed the horse in defendant's barn to be fed and in holding that he had the power to place the horse in the stable, the court said at 197 S.W. 1. c. 712:

"The constable's position in reference to his possession of the animal is entirely different from that of an ordinary bailee, * * *.

"It is the constable's duty under the law to take proper care of the animal, and if he fails to use ordinary care so to do he is liable. Murfree on Sheriffs, § 261a; Harlow's Sheriffs and Constables (2d Ed.) § 256. But it is not to be assumed that he will not place it in the custody of some one engaged in caring for like animals. The attached property being in custodia legis, the power of the constable in respect to it is not different from that of a receiver, who has taken property into his possession under the order of court appointing him."

 Therefore, the only liability of a constable is to use ordinary care in the exercise of the care and preservation of the property that he has in his custody. The rule is well established that a sheriff or constable having property in his custody, pursuant to a levy of attachment or execution thereon, is liable for its loss, damage, or destruction, whenever such loss is caused by his failure to exercise proper care and diligence to preserve it. 47 Am.Jur., Sheriff, Police, and Constables, § 60, p. 866.

In the case State, to Use of Henderson v. Clark, 2 Terry, Del., 246, 20 A.2d 127, 138 A.L.R. 704, 1. c. 708, the court in holding that a Sheriff is not an insurer of goods seized in execution, and is liable *only* for the failure to exercise ordinary care in their keeping, said: "The rule, supported by the great weight of authority, is that a Sheriff is in a position analogous to that of a bailee for hire, and is bound to exercise that degree of care in the keeping of property under levy which men in general exercise in their own concern. * * * Upon a balancing of advantages and disadvantages, we think this is a reasonable and practicable rule." For other cases supporting this rule, see the Annotation on pages 710 et seq. in 138 A.L.R.

 It is admitted that the taking of this automobile under the execution was lawful. A lawful taking is no conversion and it is held that trover is not maintainable against an officer or authorized person for mere neglect to take proper care of attached personal property. 47 Am.Jur., Sheriffs, Police, and Constables, § 182, p. 946. It has been held that where there is lawful execution that the constable has such a special property in the goods seized as to enable him to maintain trover against any person who may take them out of his possession. 47 Am.Jur., Sheriffs, Police and Constables, § 236, p. 979 (n. 19).

What we have said aforesaid demonstrates clearly that an action for conversion is not maintainable against a constable who holds property under a lawful execution. The only action maintainable against such officer is for his failure to exercise ordinary care in the keeping of the said property. Plaintiffs cite no authority to the contrary. Therefore, it follows, that an action for conversion is not maintainable against the vicarious agent of the Constable and the only action maintainable is one for negligence for the failure to exercise ordinary care in the keeping of the property. This is especially true where the evidence shows no acts upon the part of the

defendant in excess of the authority of the Constable or contrary to the order of the Constable. As we have shown, the Constable had the authority to turn the automobile over to the defendant for storage and safekeeping. Birmingham v. Carr, supra. Certainly, the storage of the car on the Reitman lot was not in excess of the authority of the Constable nor was it contrary to any order of the Constable to defendant. On the contrary, the testimony of the Constable, given in plaintiffs' case, demonstrates that he asked defendant's attorney where *he* wanted to store the automobile. Plaintiffs infer that the only place defendant was permitted to store the car was on the used car lot at Manchester and McCausland Avenues. This inference is not supported by the evidence. The Constable testified that his office had no facilities for storing cars and that was why he asked Mr. Haw where he wanted to take the car. He further testified that he gave no instructions to any employee of defendant relative to the care of the automobile. The testimony of the Constable shows that he did not direct or instruct that the car be kept at any specific place, leaving the care of the car to the defendant.

■ The evidence reveals no act or acts of the defendant that were contrary to the orders of the Constable. The removal of the car by the defendant to the Reitman lot was not an act of dominion in opposition to any right the plaintiffs had in the car. At the time the car was moved to the Reitman's lot, the car was in custodia legis and the plaintiffs had no right to specify where the car should be stored. The making of the key for the car by the defendant in order to facilitate the movement of the car while it was in storage did not constitute an act of dominion by defendant. We find that there was no evidence in this record to support instructions based upon conversion and therefore the trial court correctly refused to give plaintiffs' instructions predicated on that theory.

■ Having found that plaintiffs failed to make a submissible case on the theory of conversion, we now take up for discussion defendant's contention that plaintiffs failed to make a submissible case of specific negligence as embodied in their offered and given Instruction No. 1. In reviewing this contention we will consider only the alleged negligence submitted to the jury by plaintiffs' Instruction No. 1 upon which the verdict was returned. Thaller v. Skinner & Kennedy Co., Mo., 315 S.W.2d 124; Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91.

Plaintiffs in their Instruction No. 1 hypothesized four specifications of alleged negligence: (1) that defendant "through its agents and employees, placed a 1956 Chevrolet automobile owned by plaintiffs, and a key or keys therefor, on a lot at 2204 Forest Avenue," and (2) "that said defendant had not visited or inspected the said lot beforehand," and (3) "that at said time the left ventilator window on said automobile was broken," and (4) "said lot was not enclosed, and was accessible to persons in the vicinity thereof, * * *." The said instruction further required the jury to find that in so doing the above-mentioned acts defendant failed to exercise ordinary care and was negligent and that such negligence resulted in the car being taken from Reitman's lot.

■ The mere fact that a theft of the automobile occurred does not prove or raise a presumption of negligence. The defendant, custodian of the property, acting as agent for the Constable, is not liable for any loss by theft unless it is connected with its own negligence. 47 Am.Jur., Sheriffs, Police and Constables, § 60, p. 868; 138 A.L.R. 727 (Dorman v. Kane, 5 Allen 38, Mass.).

■ The burden was upon the plaintiffs to prove the specific negligence submitted in their Instruction No. 1 and further to prove that the alleged negligent acts

were the cause of the theft and the loss of the automobile. There must be substantial evidence on both negligence and causation in order to make a submissible case. The case is not to be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. Neither may any fact essential to submissibility be inferred in the absence of substantial evidentiary basis. In other words, liability cannot rest upon guess work, conjecture or speculation beyond inferences reasonably to be drawn from the evidence. Probst v. Seyer, Mo., 353 S.W.2d 798, 91 A.L.R.2d 1252. We think the diligence required of the defendant as agent and custodian of the Constable is such as a careful, prudent man of reasonable sense and judgment might reasonably be expected to take if the property belonged to himself.

At the threshold of our discussion of the alleged negligent acts submitted in plaintiffs' Instruction No. 1, we point out that Reitman, Corbet and the Constable were called as witnesses by plaintiffs and, therefore, they are bound by the uncontradicted testimony of their own witnesses. It is undisputed that the automobile was placed on Reitman's lot by the defendant. We do not think that the mere placement of the automobile on this lot is an act in and of itself on which negligence can be predicated or from which a reasonable inference of negligence may be found. Of course, this is provided the automobile when placed there was locked and a key was not left in the car. There was no evidence, as we shall demonstrate, to support a submission that a key or keys to the car were placed on the lot at 2204 Forest Avenue. There is no evidence in the case to support a finding that a key or keys were left in the automobile when placed on Reitman's lot. It will be remembered that Corbet, a witness for plaintiffs, testified that he saw the key and the tag attached to the key with the name "Earl Williams—'56 Chevrolet" on Reitman's keyboard after the car was stolen. He also saw the license plate of plaintiffs' automobile in the office of Reitman. Corbet in his testimony said that at the time he saw the key and license plate in the office of Reitman that he had a conversation with him in which it was stressed to him and the police officer who was present that the car was locked up and that the key and the plate were inside Reitman's building at the time of the theft. We find that this evidence which was offered on behalf of plaintiffs was never contradicted. Plaintiffs are bound by the uncontradicted testimony of Corbet. Draper v. Louisville and Nashville Railway Company, 348 Mo. 886, 156 S.W.2d 626; Reece v. Reed, Mo., 326 S.W.2d 67, l. c. 71. However, plaintiffs contend that Reitman's testimony does contradict that of Corbet, when he testified that the porter left the automobile in the rear area, without comment; that he was not given any information concerning the automobile, and that he "knew nothing of any key." They contend that this testimony certainly contradicts the testimony of Corbet. There is nothing in the aforesaid testimony, pointed out by plaintiffs, that either affirms or denies that a key was left in the car. To the contrary, is the further testimony of Reitman when he was asked if the key was delivered with the automobile, he answered "that I can't remember," again saying "I don't remember anything about a set of keys." This testimony upon the part of plaintiffs' witness amounts to no evidence and, as said in Inman's Adm'x v. United Rys. Co. of St. Louis, 157 Mo.App. 171, 137 S.W. 3, it is not even negative evidence on the point in question. Disclaimers of recollection and knowledge are unsatisfactory and unacceptable substitutes for evidence. Haire v. Stagner, Mo.App., 356 S.W.2d 305, 310–311. Therefore, Corbet's testimony remains uncontradicted. It shows that the key was in Reitman's office after the car had been stolen and, therefore, the key could have had no part in the theft of the automobile. More pertinent to the specification of negligence contained in plaintiffs' Instruc-

tion I is that there is not one bit of evidence to support a submission that a key was left in the automobile at the time it was placed on Reitman's lot.

■ The next element of negligence submitted is (2) "that said defendant had not visited or inspected the said lot beforehand." As pointed out by defendant, it being a corporation, it could only visit or inspect the lot by or through its agent or servants. Plaintiffs produced no evidence to the effect that no agent or servant of the defendant had visited or inspected Reitman's lot beforehand, nor any evidence from which such an inference could be made. A contrary inference could be drawn from the testimony of Corbet who was plaintiffs' witness. Corbet testified that Maguire suggested Reitman's place as a good place for the storage of the automobile and Reitman testified that he and Maguire had dealings "practically every day." Also, we do not feel that a showing that defendant did not visit or inspect Reitman's lot before placing the car thereon constitutes a substantial act of negligence on which liability may be predicated unless there is a further showing by plaintiffs that through an inspection defendant would have learned that Reitman's lot was not a proper or safe place for storage of the car. There was no evidence to that effect. There was no evidence this was an unsafe place to keep an automobile. We think that this alleged failure to inspect, even if true, was insufficient evidence on which to predicate negligence. We further find that the record evidence does not show that no agent or servant of defendant had ever visited or inspected Reitman's lot before placing the car thereon.

■ In connection with the third specification of negligence submitted, it is conceded that at the time the car was taken from in front of plaintiffs' premises, the left front ventilator window was forced and cracked. The principal evidence in this connection was given by the Constable when he said, "we just bludgeoned it"

enough to open the door and said by doing so the glass in the window was cracked. He said that the window was forced back (bludgeoned) just enough to get a coat hanger inside the automobile in order to pull up the latch to open the door. On this particular question Mr. Haw testified that while the left ventilator window was broken it could not be opened readily after it had been locked. The most favorable evidence that can be extracted from the testimony of these two witnesses is that the left ventilator window was broken and cracked. There is nothing in the testimony of these witnesses that would show that the broken or cracked condition of the window would make it materially easier for someone to get into the car than if the window was in an unbroken state. The only testimony in the record in this connection demonstrated that the window could not be readily opened when locked. There is no doubt that one who wanted to steal the car could gain entrance to the inside of the car in the same manner as did the tow truck driver, but there was no evidence to show that the condition of the window was such as to make access to the inside much easier. We fail to find any substantial evidence that would show that the alleged broken condition of the left ventilator window would cause or contribute to cause the theft and loss of the automobile.

■ The final specification of negligence submitted by plaintiffs' instruction was that "said lot was not enclosed, and was accessible to persons in the vicinity thereof." There is evidence to show that the lot was not enclosed and there can be little doubt that it was accessible to persons. We can think of no place that would not be accessible to one who seeks to steal an automobile. There is no doubt that if an automobile is stored in a building and the building is locked, that it is more difficult to steal the automobile, but we do not believe that it was incumbent upon the Constable or the defendant herein to store this automobile in a locked building. As

pointed out by the defendant, it is a matter of common knowledge that the great majority of the used car lots in this area are not fenced or enclosed but are open and accessible to persons in the vicinity thereof. It is also a matter of common knowledge that owners of automobiles park them over night and for substantial periods of time in front of their homes, apartments and business institutions and the cars are readily accessible to persons in the vicinity. In this very case the evidence shows that plaintiffs had their car parked on a public street. Many persons park their cars in driveways, open carports, and in lots to the rear of their premises. We do not think that leaving a car in an unenclosed place readily accessible to persons in the vicinity is an act from which negligence may be found. Of course, if the car is left unlocked or with a key in the ignition, this would present a different situation. That is not the case here. We agree with defendant when it says that if leaving a car in an unenclosed place accessible to persons in the vicinity be negligence "it would, by common knowledge, be impossible to operate and keep a car with any advantage in an area like modern Metropolitan St. Louis, without being held to be negligent."

We do not think that the record evidence in this case is sufficient and substantial enough to support a finding that defendant was negligent and that said negligence was the cause of the theft and the loss of the automobile. To rule otherwise would be to permit a recovery based upon guess work, conjecture and speculation.

For the reasons stated herein, the appeal of the defendant is dismissed and the cause is remanded to the trial court with directions to set aside the order granting a new trial on the issue of liability only and to enter a judgment for the defendant.

WOLFE, P. J., and J. MORGAN DONELSON, Special Judge, concur.