**Earl Delbert POLLARD, Respondent,**

v.

**GENERAL ELEVATOR ENGINEERING COMPANY, a Corporation, Appellant.**

**No. 51989.**

Supreme Court of Missouri,
Division No. 2.

June 12, 1967.

Motion for Rehearing or to Transfer to Court en Banc Denied July 10, 1967.

Murphy & Roche and Morris B. Kessler, St. Louis, for respondent.

Robertson, DeVoto & Wieland, Leo C. DeVoto, Jr., St. Louis, for appellant.

LAURANCE M. HYDE, Special Commissioner.

Action for $150,000.00 damages for personal injuries; verdict for defendant but plaintiff's motion for new trial was sustained. Defendant has appealed from the order granting a new trial.

Plaintiff was injured while working at the foot of a clay wall or bank, estimated as from 10 to 15 feet high, which fell on him. His claim is that the collapse of the wall was caused by vibrations from the operation of defendant's drilling rig, which was drilling in limestone 44 feet from the clay wall. The court granted a new trial for error in giving Instruction 5, requested by defendant, because of the indefiniteness of its paragraph Second. This Instruction was as follows:

"Your verdict must be for defendant whether or not defendant was negligent if you believe:

"First, plaintiff trimmed back and undercut the dirt bank and,

"That plaintiff continued to work near the undercut dirt bank and,

"That the dirt bank had no lateral shoring and,

"That plaintiff knew or, in the exercise of ordinary care, should have known it was dangerous to do so; and

"Second, plaintiff's conduct was negligent and

"Third, such negligence of plaintiff directly caused or directly contributed to

cause any damage plaintiff may have sustained."

Defendant contends this instruction was proper but also claims plaintiff did not make a submissible case failing to prove any causal connection between the operation of the defendant's drill rig and the falling of the dirt bank which caused plaintiff's injuries. Therefore, we will review the evidence from the view most favorable to plaintiff. Plaintiff was an employee of Gamble Construction Company, the general contractor for constructing a new building and renovating an older building west of the new building, hereinafter called the "renovated building". Defendant was a subcontractor to install two hydraulic elevators for the new building. On the date of plaintiff's injury, there was an excavation for the new building east of the renovated building, 180 feet long west to east and 120 feet wide, north to south. The clay wall was at the west side of excavation along the east side of the renovated building which was supported there by concrete pillars eighteen to twenty feet apart and which were east of its basement wall. A new concrete wall for the new building was to be built adjoining the east side of the renovated building. Another old building which had been on the site of the new building had been razed and its old stone foundation east of the clay wall removed. The clay wall, originally between the foundations of the two old buildings, was left between the pillars supporting the renovated building. Before plaintiff was injured, it had been trimmed by a backhoe so that at the top it was in line with the east face of the renovated building. However, the bucket of the backhoe could not reach lower than four feet above the ground so the lower four feet bowed out east beyond the pillars supporting the renovated building. On the day of his injury, plaintiff and two other workmen were instructed by their foreman to trim down the lower part of the clay bank between the first two (south) pillars so as to make the face of the clay wall even with the western side

of these pillars supporting the east side of the renovated building. After thus trimming the clay wall, they were told to bell in (undercut) the wall, cutting up two feet and cutting in about one foot. The west side of this clay wall was up against the east face of the concrete wall of the renovated building's basement (which did not come as far east as the pillars supporting its east side) so that the clay wall remaining was under the east side of the renovated building.. It was intended that the clay should remain there between the basement walls of the renovated building and the new building.

Leonard Bengard, superintendent of the Gamble Construction Company, who had sixteen years' experience as a superintendent in the construction industry, testified that he had ordered the plaintiff and two other men to shape up the wall and to undercut it in order to pour concrete there for footings for the new wall to be constructed for the new building. In order to complete the footings after the dirt wall had been prepared, it would be necessary to build wooden forms to the east of the base of the new wall so as to hold the concrete. As superintendent, he had selected the method of preparing these forms for the new wall. He did not instruct the men to put any lateral shoring on the face of the wall because he thought it would be safe without lateral shoring. Bengard could have ordered the wall braced with lateral shoring, but it would have taken longer and would have cost more. In order to support the overhang after the wall had been trimmed back even with the west side of the pillars, the men prepared pockets by digging into the base of the wall and inserting a two by ten board at the top of the pocket, which was equal in height to the proposed undercut, and a two by ten board at the bottom of the pocket. Between these boards they placed a four by four as a brace. About five to seven such pockets were cut into the bank at its base along the 20-foot length between pillars before the actual undercutting was started. This shoring in the un-

dercut part of the wall was the only shoring done, no lateral shoring being used.

Superintendent Bengard stated that as part of his duties it was necessary for him to notify the various subcontractors when they were needed and that he had called the defendant to send its men to the job site to start the drilling work. He had instructed defendant's employees, when they arrived with the drill rig about a week before the accident, where to drill and had decided to drill the westernmost hole first as the plans called for work on the job to progress eastwardly from the old building towards Jefferson Avenue. The hole was to be dug according to the plans 44 feet east of the dirt bank in question, it was to be 18 inches in diameter. The drill being used by defendant's employees was of a concussion type with a bit 18 inches in diameter. Its total weight was about 13,000 pounds. The drill bit, together with its stem, which was attached to a cable suspended from a boom, weighed approximately 1500 to 2000 pounds. The drill was operated by a gasoline engine which raised and lowered the drill bit at the rate of approximately 60 strokes per minute. The length of the stroke was about one foot. According to the drill operator, by the morning of the accident, the hole had reached a depth of 25 to 32 feet, drilling into limestone. The drill rig was operating on the morning of the accident when Superintendent Bengard sent the plaintiff and his two fellow workers to the southwest corner of the excavation in order to prepare the dirt wall for the footings. He did not at any time, before the accident occurred, ask the men from General Elevator Engineering Company to stop their drilling, although as superintendent and boss on the job he could have done so.

It took the men approximately 1½ to 2 hours to trim the wall back and make the undercut. After they had finished belling in the dirt bank, the three men were cleaning up the loose dirt in front of the bank and while so doing plaintiff heard the boom (drill bit) go down for the first time,

not having previously noticed it, felt vibrations and then heard one of the other men call out "Here comes the wall." As plaintiff was attempting to escape, he saw that dirt was coming out at the north end of the dirt bank under which he was working. Plaintiff was trapped by the falling dirt and buried up to his shouders. The portion of the dirt wall which fell came out from the top of the wall in the upper right-hand section and was variously estimated as from five feet to one-half the total length of the upper portion of the dirt bank between the two pillars where plaintiff was working. The balance of the undercut wall did not collapse.

Defendant's expert witness Edward Bilhorn inspected the place after the concrete wall of the new building was completed but could see the type of soil between the walls of the two buildings. He stated that in digging in clay one cannot dig indefinitely and expect a bank of the excavation to remain supporting itself, because clay dries out and loses its cohesive strength and ability to retain itself in position. Clay, as it exists in the ground, is affected by the availability or lack of moisture and does not dry out uniformly. It was his opinion that since only a portion of the undercut dirt bank had fallen that a crack or fault had developed in that area and that the section above the crack or fault was no longer able to maintain itself in position. He stated that clay banks will collapse sooner or later and that he was familiar with the fact that the Corps of Engineers prescribes, as a safety precaution to prevent cave-ins, that all lateral cuts in clay banks in excess of four feet be shored. Bilhorn was not a specialist in the field of soil mechanics, which subject deals with the properties of soil strength and ability to bear structures. He answered a hypothetical question wherein he was asked to state whether he had an opinion as to whether or not there was any contributing effect or any relationship between the dropping of this drill bit and the falling off of the dirt at the top of the cut. His answer was, "In my opinion, I think it

would have been a contributing influence to the disturbance of that bank." Bilhorn after saying it would be hazardous to have men working at the foot of the undercut wall, further testified: "Q And now let's superimpose on that hazardous wall a drill rig which has a 1,500 to 2,000 pound bit. What effect if any would operating that rig within 40 feet of that hazardous wall tend to have on the wall? A I think it makes it even more hazardous to cause part of it to fall."

We also note that defendant's expert, Henry Reitz, although stating: "I don't think that the operation of the drill rig would be what made the wall fail," on cross-examination testified further: "Q Well, Mr. Reitz, getting back again to this other question, could the drill rig have caused this wall to collapse sooner than it would have if the drill rig wasn't operating? A If the word could means in the realm of possibility, you have already covered that. Q Your answer then is yes? A It could have, but I do not think it would have." (See Kimmie v. Terminal Railroad Association, 334 Mo. 596, 66 S.W.2d 561, 565.) Defendant's witness Bengard, the General Contractor's superintendent with 28 years' total experience in construction (after other assumptions of the facts) testified: "Q And assume further while these men were cutting down this bank they could feel this drill rig and vibrations from the drill rig. Do you have any opinion based upon your experience as to whether or not there was any relationship between that drill rig operating and this dirt that fell down off the wall? A Well, I felt, and in my deposition there to the office, that I felt that it was a contributing factor. Q And is that your judgment today too, sir? A Yes, sir. * * * Q Mr. Bengard, assuming that there was a crack at the top of this excavation do you have an opinion based upon your years of experience as to what effect a vibration from a 13,000 pound drill rig would have upon loosening that crack and loosening the dirt? A Yes, sir, shake it loose." Other facts are stated in con-

nection with our ruling on the causal connection issue.

Defendant contends plaintiff relied solely on the opinion of his expert witness, Bilhorn, to establish causal connection and says his opinion lacked any factual basis, was based only on speculation and conjecture and therefore was not substantial evidence justifying submission, citing Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844; Craddock v. Greenberg Mercantile, Inc., Mo.Sup., 297 S.W.2d 541; and Turner v. Haar, 114 Mo. 335, 21 S.W. 737, holding that an expert's opinion to amount to substantial evidence "must have a substantial basis in the facts actually established." Defendant's argument is that the crucial issue "was not whether there were vibratory disturbances, but whether they were of sufficient force to disturb the bank enough to cause the dirt to fall." Defendant says: "The question omitted is how strong they actually were"; and that "evidence that they could have been felt at the bottom of the excavation was not evidence that they could have been felt at the top in a sufficient degree to cause the falling of the dirt." Defendant further says: "[T]here was no evidence to connect the falling of the dirt with the vibration and proves defendant's contention that there was no evidence of causal connection in this case."

In the Turner case relied on plaintiff was injured in the collapse of a building when the roof was blown off by a violent storm. Plaintiff sought to recover on the theory that vibration from operation of the machinery used in manufacturing clothing had previously weakened the walls and floors. The court said this issue was a proper one for opinion evidence but said (21 S.W. l.c. 738): "In this case, however, the evidence was worthless, and improperly admitted, for the reason that the witnesses were not put in possession of all the facts necessary to enable them to form an intelligent opinion. * * * The effort seems to have been to supply a proof of facts by use of opinion evidence, instead of proving the facts, and giving the jury the benefit of the opinion

of witnesses on the facts as proved." For the reasons hereinafter stated we do not find that to be the situation here.

We have said: " 'Causal connection, it is true, must be proved by the evidence, as a fact, and not be left to mere speculation and conjecture. The rule, however, does not require that there must be direct proof of the fact itself. This would often be impossible. It is sufficient if the facts proved are of such a nature and are so connected and related to each other, that the conclusion therefrom may be fairly inferred.' " Pentecost v. St. Louis Merchants' Bridge Terminal Railroad Co., 334 Mo. 572, 66 S.W.2d 533, 536, quoting from Frese v. Wells, Mo.Sup., 40 S.W.2d 652, 654. We further said therein: "What is a proximate cause is ordinarily a jury question." We consider that there was sufficient circumstantial evidence in this case to support a finding of causal connection between the operation of defendant's drill rig and the collapse of the clay wall. Plaintiff said that on the day before he was injured, while he was working 100 feet from the drill rig, he could feel vibration from it through his feet and saw dirt fall off the bank. The two men who were working on the wall with plaintiff, called as witnesses by defendant, each said the drill rig was operating at the time the wall collapsed and that he could feel its vibration in the ground through his feet. Each said he did not see the clay bank shake and there was no direct proof that the clay wall did vibrate or shake. Nevertheless, the wall did fall and it was shown that there were strong vibrations in the ground up to it and we consider these facts with the other circumstances in evidence to be a sufficient factual basis for an expert opinion as to what effect these vibrations would have on the wall. Therefore, we hold there was sufficient factual basis from this evidence on which to authorize expert opinion that there was sufficient vibration from defendant's rig to be a direct contributing cause to the collapse of the wall. While Bilhorn's testimony was somewhat indefinite, taken as a whole it can rea-

sonably be construed as an opinion that the vibration caused by the rig increased the hazard of a collapse of the wall and directly contributed to its fall. Furthermore, his opinion was supported by that of Superintendent Bengard. We, therefore, hold that plaintiff had sufficient evidence of causal connection to make a submissible case.

Instruction 5 was a modification of M.A.I. 28.01. However, paragraph Second of 28.01 (omitted in this instruction) is: "Second, plaintiff's conduct in any one or more of the respects submitted in paragraph First, was negligent." The court stated its reasons for granting a new trial in its order, as follows: "That Instruction No. 5 is prejudicially erroneous in that paragraph Second of such instruction gave the jury a roving commission and allowed the jury to consider any kind of conduct, act or omission of plaintiff whether or not specifically submitted, that they, the jurors, thought was failure to exercise ordinary care on behalf of plaintiff and which they, the jurors, thought could be decisive on the factual issue of contributory negligence whether in fact such act was or was not supported by the evidence and thereby allowed the jury to find plaintiff contributorily negligent by reason of acts which are not set forth in paragraph First. Such paragraph Second does not in any way refer to the alleged acts set forth in paragraph First and does not restrict the jury to only those acts submitted in paragraph First and therefore the jury could have found plaintiff contributorily negligent by the mere fact that he was a laborer on the job or could have found him negligent for any other reason which struck the fancy of a juror thereby defeating plaintiff's recovery on this issue, and gave the jury a roving commission to find for defendant upon any speculative basis it could construct or evolve out of its own mind."

We consider Heimos v. Bruce, Mo. Sup., 393 S.W.2d 477, and Endermuehle v. Smith, Mo.Sup., 372 S.W.2d 464, cited by plaintiff, support the trial court's view.

Furthermore, it is a familiar, well established principle that this court will be more liberal in upholding the trial court's action in sustaining a motion for new trial than in denying it; because to reverse the court's action in denying a new trial would require a reversal of a judgment. See cases in West's Missouri Digest, Appeal and Error, ▮▮▮ This also is because the power of the trial court to grant a new trial is an exercise of its judicial discretion, which may be based upon matters known to the court (often said to be in the breast of the court) because the trial judge participated in the trial and knew what took place. Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297, 300. We also note that this instruction conveyed the impression of plaintiff trimming the bank alone on his own initiative, ignoring the fact that plaintiff was working with others under direction of his foreman. We consider this would make the general submission of negligent conduct in paragraph Second more susceptible of misunderstanding. The first paragraph would be more in accord with the situation shown by the evidence if it stated: "First. Plaintiff and his fellow workmen had trimmed back and undercut a dirt bank and that the dirt bank had no lateral shoring and that plaintiff continued to work near the undercut dirt bank and that plaintiff knew, etc." In this case the trial court, from direct observation of the trial, had the best opportunity to evaluate and determine the effect of the general submission in paragraph Second of this instruction; and in its order it specifically set out its reasons for considering this instruction prejudicial.

The order granting a new trial is affirmed and the cause remanded.

PER CURIAM:

The foregoing opinion by HYDE, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.