Bernell **MERRIMAN**, Plaintiff-Respondent,

v.

Mrs. John **JOHNSON**, Defendant-Appellant.

No. 9192.

Missouri Court of Appeals,
Springfield District.

June 11, 1973.

Schroff, Keeter & Glass, Bob J. Keeter, Robert W. Schroff, Springfield, for defendant-appellant.

Donald E. Bonacker, Springfield, for plaintiff-respondent.

STONE, Judge.

This is the sad saga of the unlucky demise of "Lucky," a short-haired pointer registered under the name of "Conviction" and owned by plaintiff Bernell Merriman. In his amended petition, plaintiff charged that on November 17, 1970, defendant Mrs. John (Shirley) Johnson *"negligently* shot and wounded" Lucky requiring his destruction by a veterinarian; and, in her answer and subsequently upon trial, defendant not only admitted shooting Lucky but also averred that she had done so intentionally when Lucky was discovered in the Johnson chicken house and in the act of chasing, attempting to kill, and killing chickens and ducks owned by the Johnson family. (All emphasis herein is ours.) Under plaintiff's verdict-directing instruction 4 requiring findings, inter alia, that defendant shot Lucky and *"was thereby negligent,"* the jury returned a verdict for plaintiff and assessed his damages at $400. From the judgment entered upon that verdict, defendant appeals. Her "Points Relied On" here [Rule 84.04(d) V.A.M.R.], one of which is that "plaintiff failed to make a submissible case of negligence," require an examination of the evidence.

About September 1, 1970, defendant, her husband and their four children moved into a farm home on a 5-acre tract on the east side of a north-south road in the southwest quadrant of Greene County. Three outbuildings were located on this tract, namely, a smokehouse near the rear of the dwelling, a chicken house about twenty to thirty feet behind or east of the smokehouse, and a barn some distance north of the chicken house. There were two openings in the chicken house, to wit, one of undisclosed dimensions (sometimes referred to as "a door") in the south end which was covered with a piece of tin "either propped or [with] just a nail or board or something holding it," and another described as "a small opening" for the chickens. The chicken house was not within a fenced enclosure, but it provided a place of shelter and abode for defendant's flock of about twenty chickens acquired to supply eggs for family use.

From defendant, the only witness testifying concerning the course of events in and around the chicken house on the afternoon of Tuesday, November 17, 1970, we glean the following. As defendant was reading the newspaper in her home that afternoon, her "older boy" [1] Johnny came into the

---

1. Defendant's four children were then thirteen, eleven, nine or ten, and five years of age, but the record does not reveal how many of the four children were boys or the age of the "older boy."

house and reported, "Mama, there's a white dog out there chasing the chickens and he's going out through the field." She immediately "went into the bedroom where we kept the gun," a .22 automatic rifle already loaded with about eighteen short shells, and carrying that weapon walked toward the chicken house. When she first went outside the house, she saw and heard nothing unusual; but, when she was "almost to the chicken house"—"approximately fifteen feet" from it—she "heard a racket . . . chickens squawking, all of them at once." Surmising that the dog was then in the chicken house, she asked Johnny to "scare it back out"; but, before he could do so, "that dog came flying out" with a chicken in his mouth, striking and knocking down the tin over the door, and other chickens "were flying out at the same time." Still carrying the chicken in his mouth, the dog immediately began "going around and around the chicken house . . . counterclockwise" and circled it several (perhaps as many as ten) times, with the chickens "just going every which way." The dog "acted plumb wild" and "wouldn't go away," and defendant was "scared" and "frightened." As the dog continued to run around the chicken house, defendant shot at him (so she thought) as many as ten to fifteen times. Finally, one of the bullets struck the dog; and, at a point in front and thus *east* of defendant, his "hind legs went down" and he "laid there, not very long . . . I'd say seconds" before he "got up on all four legs," and was able to move a short distance to the *south* into some Johnson grass in the nearby "garden spot" where he briefly turned to the west before, turning again, he reversed his original direction and returned a short distance to the *north*, reaching a point "back of the smokehouse" and thus *west* of defendant, before his hind legs finally collapsed. However, he dragged himself to the barn north of the chicken house, no doubt attracted to that area by the barking of a young pup recently acquired by defendant's family and tied at the barn. After the dog was shot, defendant found six dead fowl, two ducks that defendant's grandparents had given to her children and four chickens, scattered around the chicken house.

Passing to the testimony of plaintiff Merriman, we find that on the afternoon of November 17, 1970, he took Lucky and Tim, one of Lucky's pups, into the neighborhood of defendant's home to work them in the field. He had worked dogs in that same area during previous years when another family occupied the house into which defendant and her family moved in September 1970; but, on the date of the events here discussed, plaintiff did not know, and made no inquiry to determine, who then lived on "the Johnson place" or what stock or fowl was kept there. Parking his truck on an east-west road "somewhere between a half and three-quarters of a mile" (so he "guessed") south of defendant's home, he "took Tim out and run him" first in the open "rolling land" between the truck and defendant's home, working Tim "within seventy-five to a hundred yards" of the Johnson house—"somewhere around a hundred yards east of the chicken house." However, plaintiff's primary interest that afternoon was "trying to get [Lucky] ready for . . . a national amateur [field trial] in St. Louis November 4th and 5th (sic), I believe." In furtherance of that purpose, plaintiff ran Lucky to the north in the same area "to see if I could send him further out and how he handled." In accordance with Lucky's training, plaintiff sent him away by sounding "two short blasts" on a whistle; and, when last seen by plaintiff prior to the shooting at defendant's chicken house, Lucky was north of plaintiff and was running to the north over the crest of a rise which (so plaintiff opined) was about 250 yards from defendant's home.

When Lucky thus disappeared from sight over the brow of the hill, plaintiff was "half a mile, maybe a little over" north of the east-west road on which he had parked his truck. Thereafter, plaintiff "probably walked a little further" before

he decided to sound the signal for Lucky's return, i.e., "a long blast" on the whistle. When Lucky failed to respond to the first such signal within a reasonable time, plaintiff repeated that signal at appropriate intervals "several times . . . at least two, three or four times." After this period of whistle signals, plaintiff "thought I heard rifle shots . . . I thought six or seven." And, having failed to effect Lucky's return by use of the whistle, plaintiff finally fired his shotgun—"it'll come nearer to getting [a dog] back than anything I know of." Both that and a subsequent second discharge of his shotgun likewise proving ineffectual, plaintiff began to walk toward defendant's home, approaching it from the southeast[2] and en route thereto climbing over or stepping through some barbed wire fences. Reaching the fence south of defendant's "garden spot," plaintiff inquired whether defendant had seen a bird dog and she responded in the affirmative, stated that "it was killing my chickens" and she had shot it, and directed plaintiff to the barn where the injured dog was lying. Plaintiff there found and identified that dog as Lucky and shortly thereafter returned the dog to Springfield and placed it in the care of a competent veterinarian, who subsequently operated but was unable to save it.

Upon trial, the veterinarian stated that Lucky had only one wound resulting from a bullet which followed a generally "posterior" course in the dog, indicating that the dog was facing or coming toward the person who shot him. Although Lucky's hind legs were paralyzed at the time of the veterinarian's initial examination, he could not say whether such paralysis occurred immediately when the dog was shot or developed over a subsequent period which might have ranged from a minute to an hour.

Plaintiff does not, and could not well, complain about defendant firing at the dog which bolted out of her chicken house with one of her chickens in his mouth [§ 273.-030, RSMo 1969]; but plaintiff theorizes Lucky was not that dog and defendant was negligent in shooting Lucky when he subsequently appeared on the scene, attracted thereto by defendant's series of shots theretofore directed at the guilty dog who escaped. In other words, plaintiff conjectures that two dogs were involved in the chicken house affair, to wit, (1) the guilty marauder (then unidentified and never thereafter sighted or found) who charged out of the chicken house, ran south into the "garden spot" and disappeared, and (2) Lucky, who in accordance with his training innocently responded to defendant's rifle shots directed at the marauder, ran north out of the "garden spot," and was shot "negligently" and without justification.

The principal circumstance upon which plaintiff's counsel undertakes to support this artful, ingenious theory is defendant's statement in a pre-trial deposition, repeated when called to the witness stand at the outset of plaintiff's evidence upon trial, that the marauder who rushed out of the chicken house and chased the other chickens around their nesting place was "a long-haired dog," whereas in fact Lucky was a short-haired dog. It may be noted in passing that defendant also told plaintiff's counsel that "in all the excitement, it would be hard to say for sure what [the hair] was, whether it was long or short, when [the dog] came out of the chicken house." But putting that aside, other relevant and significant circumstances overwhelmingly militate against and convincingly deny the validity of plaintiff's two-dog theory. The *only* witness who testified concerning the chicken house affair was defendant. She said the marauder was "white and had a little brown on its head," an accurate description of Lucky; and she positively identified Lucky in a photographic exhibit as the dog that broke out of the chicken house. That was the dog whose "hind legs went down" when he was shot while in front and thus *east* of

2. Defendant said that "when I first saw [plaintiff] he was walking right straight from the east."

defendant, and who soon moved a short distance to the south into and through some Johnson grass in the "garden spot." As plaintiff's counsel emphasize, that dog was out of sight "at times" while in the "garden spot." But the front or west portion of the "garden spot" was only about ten feet south of defendant's home and the rear or east portion thereof was not much farther south of the chicken house, which was directly behind or east of the house. So, when asked "could you follow [the dog's] travel . . . through that area," defendant assured counsel "yeah; it wasn't gone long enough to get out of sight very long"; and she emphatically stated that "the dog that came . . . out of there [the garden spot] had been shot" and that, when "it came back" to the north, reaching a point behind the smokehouse and thus *west* of defendant, where the dog's hind legs finally collapsed, "I could see blood . . . kind of back from the middle, a little ways back from the middle of the dog." Finally, there was not a scintilla of evidence that defendant fired another shot at any time subsequent to the series of shots directed at the marauding dog as it burst out of the chicken house and circled it repeatedly.

■ In determining the sufficiency of the evidence to make a submissible case, we consider the evidence in the light most favorable to plaintiff and accord to him the benefit of all supporting inferences fairly and reasonably deducible from the evidence. Hecker v. Schwartz, 426 S.W.2d 22, 26(2)(Mo. 1968); Berry v. Harmon, 329 S.W.2d 784, 789(3)(Mo. 1959). But this broad principle is necessarily subject to the sensible qualifications and limitations that the court is not thereby required or permitted to supply missing evidence or to disregard the dictates of common reason and accept as true that which, on the whole record, obviously is not true, or to give plaintiff the benefit of unreasonable, speculative or forced inferences. Adler v. Laclede Gas Co., 414 S.W.2d 304, 306(1)(Mo. 1967); Kirks v. Waller, 341 S.W.2d 860, 863(3)(Mo. 1961); Atcheson v. Braniff International Airways, 327 S. W.2d 112, 117(7)(Mo. 1959); Shelton v. Bruner, 449 S.W.2d 673, 676 (Mo.App. 1969); Martin v. Sherrell, 418 S.W.2d 209, 211(1)(Mo.App. 1967). And in this connection we remind ourselves that "[a]n inference is a deduction logically and properly drawn by reason from proven or admitted facts. It is more than, and cannot be predicated on, mere surmise or conjecture, i.e., ' "the possibility that a thing could have happened. . . . an idea or a notion founded on the probability that a thing may have occurred . . . ." ' Draper v. Louisville & Nashville R. Co., 348 Mo. 886, 893, 156 S.W.2d 626, 630; Louisville & Nashville R. Co. v. Mann's Adm'r., 227 Ky. 399, 13 S.W.2d 257, 258." Smith v. Seven-Eleven, Inc., 430 S.W.2d 764, 769(4), and cases there collected in notes 3 to 9, incl. (Mo.App. 1968); Economy Gas Co. v. Bradley, 472 S.W.2d 878, 880 (Mo. App. 1971).

A "case is not to be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. Neither may any fact essential to submissibility be inferred in the absence of substantial evidentiary basis. In other words, liability cannot rest upon guesswork, conjecture or speculation beyond inferences reasonably to be drawn from the evidence. Willey v. Fyrogas Company, 363 Mo. 406, 251 S.W.2d 635, 642; Brawley v. Esterly, Mo., 267 S.W.2d 655, 659; Quinn v. St. Louis Public Service Co., Mo., 318 S.W.2d 316, 323; 32 C.J.S. Evidence § 1042, p. 1116 [now 32A C.J.S. Evidence § 1042, p. 797]. The question of whether the evidence in a given case is substantial is one of law for the court. Vietmeier v. Voss, Mo., 246 S.W.2d 785, 787–788; Tharp v. Monsees, Mo., 327 S.W.2d 889, 899." Probst v. Seyer, 353 S.W.2d 798, 802(2,3), 91 A.L.R.2d 1252 (Mo. 1962); Gibson v. Newhouse, 402 S.W.2d 324, 327–328(6–9)(Mo. 1966); Graham v. Conner, 412 S.W.2d 193, 203(19,20)(Mo.App. 1967).

Of course, the jury in the instant case was at liberty to believe all or none of the testimony of any witness, or to accept it in part and reject it in part, as it may have found the same to be true or false when considered in relation to the other testimony and the facts and circumstances of the case. Appelhans v. Goldman, 349 S.W.2d 204, 208(9) (Mo. 1961); Rakestraw v. Norris, 478 S.W.2d 409, 419(22) (Mo.App. 1972); Jordon v. Johnson, 411 S.W.2d 451, 454(1) (Mo.App. 1967). But the judgment under review cannot be justified or supported on the theory that the jury rejected all or some portions of defendant's testimony, for the burden rested upon plaintiff to prove the facts essential to recovery on his two-dog theory of the case [Hymer v. Dude Hinton Pontiac, Inc., 332 S.W.2d 467, 469(3) (Mo.App. 1960); White v. Prudential Ins. Co. of America, 235 Mo.App. 156, 167, 127 S.W.2d 98, 104(9) (1939)] and rejection or disbelief of all or any part of defendant's testimonial account would not have been the equivalent of, and would not have constituted an acceptable substitute for, affirmative proof of those contrary facts essential to plaintiff's recovery on his two-dog theory. State v. Taylor, 422 S.W.2d 633, 637–638 (Mo. 1968); Nevinger v. Haun, 197 Mo.App. 416, 426, 196 S.W. 39, 41 (1917); Fausette v. Grim, 193 Mo.App. 585, 594, 186 S.W. 1177, 1180 (2) (1916); Spain v. Burch, 169 Mo. App. 94, 108, 154 S.W. 172, 176(6) (1913); Boatmen's Savings Bank v. Overall, 16 Mo.App. 510, 516(4) (1885); Zarrillo v. Stone, 317 Mass. 510, 58 N.E.2d 848, 849(2) (1945); Cruzan v. New York Central & H. R. R. Co., 227 Mass. 594, 116 N.E. 879, 880 (1917); Eckenrode v. Pennsylvania R. Co., 164 F.2d 996, 999 (3rd Cir. 1947), aff. 335 U.S. 329, 69 S.Ct. 91, 93 L.Ed. 41; Moulton v. Moulton, 178 Minn. 568, 227 N.W. 896, 897 (1929); Morgan, The Law of Evidence, 59 Harv. L. Rev. 481, 558 (1946).

■ Careful consideration of the record with due regard for the foregoing principles constrains the conclusion, so we are convinced, that plaintiff did not make a submissible case. If other or more favorable evidence had been obtainable, we are satisfied that it would have been produced by plaintiff's perspicacious counsel. No pleaded theory, on which plaintiff might make a submissible case with the available witnesses and evidence being suggested or apparent, it becomes our duty to dispose of the case finally [Rule 84.14; Bailey v. Kershner, 444 S.W.2d 10, 16(8) (Mo.App. 1969)], as has been done frequently in similar situations. Graham v. Conner, supra, 412 S.W.2d at 205(26), and cases there cited.

The judgment for plaintiff is reversed.

TITUS, C. J., and HOGAN, J., concur.

BILLINGS, J., not participating because not a member of the court when this cause was submitted.