**TRI–CONTINENTAL LEASING CO.,**
**Plaintiff-Appellant,**

v.

**Arthur F. G. NEIDHARDT et al.,**
**Defendants-Respondents.**

No. 37245.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Aug. 10, 1976.

Davis & Davis, Warren W. Davis, Robert Schwendinger, Clayton, for plaintiff-appellant.

Ziercher, Hocker, Tzinberg, Human & Michenfelder, George Bude, Clayton, Nick Vasileff, Madison, Ill., and Warren Friedman, St. Louis, for defendants-respondents.

GUNN, Judge.

This appeal concerns an action for tortious interference with a contract. Plaintiff-appellant, Tri-Continental Leasing Company (Tri-Continental) instituted action against the defendants-respondents, Arthur Neidhardt, Louis Levin, and Midwest Petroleum Company (Midwest) alleging that defendants, in some sort of cabal and without justifiable cause, procured the breach of a leasing agreement between the plaintiff and James Rayfield, thereby euchring plaintiff out of a profit. Pursuant to the agreement, Rayfield was to lease commercial laundry equipment from Tri-Continental for a term of 60 months. Tri-Continental sought both actual and punitive damages. The jury awarded the plaintiff $9,600 in actual damages and assessed punitive damages against defendant Neidhart at $2,000, against defendant Levin at $5,000, and against defendant Midwest at $5,000. The trial court sustained the defendants' motions for directed verdict and thereby set aside the jury verdict. The plaintiff appeals the ruling, asserting that the evidence was sufficient to support the jury verdict.

Prior to presentment of the facts, we delineate the general legal principles that govern this appeal and which gave direction to a denouement of this complex case. To make a submissible case under its theory of recovery, the plaintiff must produce substantial evidence that will support each and every element of the cause of action. No fact essential to submissibility can be inferred in the absence of a substantial evidentiary basis. Liability cannot be based upon speculation, conjecture or guesswork. *Probst v. Seyer,* 353 S.W.2d 798 (Mo. 1962); *Frazier v. Stone,* 515 S.W.2d 766 (Mo.App.1974); *Merriman v. Johnson,* 496 S.W.2d 326 (Mo.App.1973). When asserting a cause of action for intentional inducement of a breach of contract, the plaintiff must show that the defendant maliciously, that is, with knowledge of the contract and without justifiable cause, induced the breach. *Cady v. Hartford Accident and Indemnity Co.,* 439 S.W.2d 483 (Mo.1969); *Downey v. United Weather Proofing, Inc.,*

363 Mo. 852, 253 S.W.2d 976 (1953).[1] To properly submit its case, the plaintiff must establish by substantial evidence the following five elements: 1) that a contract was in existence; 2) that the defendant had knowledge of the contract; 3) that the defendant induced or caused the breach of the contract; 4) that the defendant's acts were not justified; and 5) that the plaintiff thereby suffered damages. *Cady v. Hartford Accident and Indemnity Co.,* supra; *Downey v. United Weather Proofing, Inc.,* supra. See also *Harber v. Ohio National Life Insurance Company,* 390 F.Supp. 678 (E.D.Mo.1974) aff'd, 512 F.2d 170 (8th Cir. 1975); 45 Am. Jur.2d Interference, § 39 (1969). We find that the plaintiff has failed to meet its burden as to the third element—that the defendants induced or caused the breach of the contract—and will assume arguendo that the plaintiff has produced sufficient evidence to establish the other elements of its cause of action.

In determining whether the plaintiff has made a submissible case, and, consequently, whether the trial court erred in setting aside the jury verdict, we are guided by the rather primordial principle that we must view the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of all inferences which may be reasonably drawn from the evidence that supports its cause of action. *Smith v. Allied Supermarkets, Inc.,* 524 S.W.2d 848 (Mo.banc 1975). Of course, we will not make the plaintiff's case for it by supplying missing evidence. *Merriman v. Johnson,* supra; *Graham v. Conner,* 412 S.W.2d 193 (Mo.App.1967). Having so postulated, we now essay dauntedly and with effort to collocate the relevant facts deducible from the somewhat desultory gallimaufry of evidence produced by plaintiff.[2] In

fairness, we note that plaintiff was plagued by fulsome interruptions in the form of objections from defendants' attorneys which permeated the entire trial and which in turn has made difficult our task of assimulating a sensible factual statement.

The identity of the parties and their relationship to one another is as follows. The plaintiff, Tri-Continental, was in the business of leasing equipment to be used for manufacturing or in commercial enterprises. James Rayfield, an individual who desired to go into the laundry business, executed a lease for commercial laundry equipment with Tri-Continental. Defendant Arthur Neidhardt, d/b/a Monday's Maid Coin Laundry, was a distributor for Cook Equipment Company of Dallas, Texas, which manufactured the laundry equipment to be used by Rayfield in his laundromat. Defendant Midwest owned the land upon which Rayfield's laundromat was to be located. Defendant Louis Levin was the president of Midwest.

In early 1972, James Rayfield met with Arthur Neidhardt to discuss the possibility of Rayfield's opening a Monday's Maid Coin Laundry operation. About the same time, Louis Levin approached Neidhardt with the idea of establishing a laundromat on property owned by Midwest in Belleville, Illinois. Levin and Neidhardt had been involved in previous business transactions involving car washes and laundromats. Neidhardt introduced Rayfield to Levin and they discussed leasing Midwest's property to Rayfield for the purpose of operating a laundromat. Rayfield thereupon entered into a lease with Midwest. Rayfield had difficulty in obtaining financing for the purchase of the laundry equipment, so he turned to Neidhardt and Levin for assist-

---

1. The rationale underlying the cause of action for inducing the breach of a contract was articulated in *Downey v. United Weather Proofing,* supra:

   "The right to perform a contract and to reap the profits therefrom, and the right to performance by the other party, are property rights entitling each party to the fulfillment of the contract by performance. And the intentional interference with the contractual relation without just cause so as to effect a breach of the contract is a wrong for which the wrongdoer may be held accountable in damages. The right of recovery for inducing a breach of a contract is but one instance of the protection which the law affords against unjustified interference in business relations." *Id.,* 253 S.W.2d at 980.

2. The defendants did not put on any evidence.

ance in obtaining the needed financing. Neidhardt contacted Levin asking him if he knew of anyone who would either finance or lease the equipment to Rayfield. Levin explained that he had previously done business with Tri-Continental and introduced Neidhardt and Rayfield to Orion Litzinger, Jr., an officer of Tri-Continental. Negotiations were held, and near the end of March 1972, a lease agreement was entered into between Tri-Continental and Rayfield. In essence, the lease agreement was a financing arrangement whereby Rayfield was able to obtain the necessary equipment to run his laundromat.

The lease between Tri-Continental and Rayfield was signed by Rayfield and his wife on March 20, 1972 and by the president of Tri-Continental. Under the terms of the agreement, Tri-Continental was to obtain the laundry equipment from a supplier and Rayfield was to lease the equipment for a period of 60 months with an option to purchase the equipment at the end of the term for $3,300. Monthly payments were to be $932. The lease was to begin on August 5, 1972 and was contingent upon Rayfield's obtaining a lease of the Belleville site from Midwest.[3] Before the lease was signed, Tri-Continental required Rayfield to pay $932 as earnest money. Rayfield only had $500 but was able to satisfy this requirement by obtaining a loan of $450 from Neidhardt.

In addition to the actual lease agreement, Tri-Continental required that several other documents be executed. These were designed to provide additional security for the performance of the lease. Tri-Continental viewed these documents as indispensible due to the low collateral value of the laundry equipment itself.[4] One such document

was a lease purchase agreement entered into between Tri-Continental and Midwest on March 20, 1972, by which Midwest guaranteed performance of the lease. Pursuant to the terms of this agreement, if Rayfield defaulted within the first 30 months of the lease, Tri-Continental could demand that Midwest purchase the laundry equipment for $20,000. If Rayfield were to default in the last 30 month period of the lease, Tri-Continental could demand that Midwest purchase the equipment for $15,000. In conjunction with this agreement, Tri-Continental required that the board of directors of Midwest pass a resolution authorizing Levin, as its president, to execute the lease purchase document. This was accomplished on March 20, 1972. Tri-Continental also entered into a "holdback" agreement with defendant Neidhardt. Pursuant to this document, Tri-Continental was permitted to hold back $10,000 of Neidhardt's commission from the sale of the laundry equipment for a period of 30 months. If Rayfield were to default on the lease, the $10,000 would be paid over to Tri-Continental as liquidated damages. The holdback agreement was executed April 13, 1972. As further security, Rayfield was required to supply Tri-Continental with a note and deed of trust on his home. At the time of the signing of the lease, Litzinger gave Rayfield an additional document, a delivery and acceptance form, which was to be signed and returned by Rayfield once the equipment was delivered and in good working order. Under the terms of the delivery and acceptance form, Tri-Continental's obligation to pay Cook Equipment (the equipment manufacturer) for the equipment was contingent upon receipt of the completed document from Rayfield.[5]

---

3. There is no dispute that this condition was satisfied. Rayfield testified that he did have a lease agreement with Midwest.

4. The equipment was said to have a liquidation or default value of some 10%.

5. Although, as stated above, we have assumed for the purposes of this opinion that the plaintiff has introduced sufficient evidence to establish the first two elements of his cause of ac-

tion, namely, that a contract was in existence and that the defendants had knowledge thereof, we believe that the above stated facts would be sufficient to demonstrate that by the end of March 1972, a contract had been entered into between Rayfield and Tri-Continental. Furthermore, the various security agreements entered into between the plaintiff and the various defendants are directly tied to the contract between Tri-Continental and Rayfield and, thus,

After the equipment lease had been signed, Tri-Continental sought to obtain financing for the purchase of the equipment. After being unsuccessful with a New York bank, Tri-Continental was able to secure a letter of commitment from the Bank of St. Louis. The letter, which was introduced into evidence, was dated April 17, 1972 and committed the bank to loan Tri-Continental $40,000. The letter provided that the commitment would extend through June 20, 1972.[6] Upon receipt of the commitment letter, Tri-Continental sent a purchase order for the laundry equipment to Neidhardt as distributor for Cook Equipment Company on April 17, 1972. The equipment was delivered during the end of April and the early part of May. Rayfield experienced some problems with the machines which he worked on with the assistance of Neidhardt and a service man from Cook Equipment during the month of June. By July, the equipment was in substantially good working order with the exception of three problems which Rayfield regarded as insignificant in terms of loss of income. However, Rayfield did not sign and return the delivery and acceptance form to Tri-Continental at that time. Beginning in early July,

Neidhardt began complaining to Tri-Continental that payments had not been made on the equipment to Cook Equipment. Litzinger testified that he continually responded to these complaints by informing Neidhardt that Tri-Continental was not obligated to pay for the equipment until it received the completed delivery and acceptance form from Rayfield.[7]

The contract between Tri-Continental and Rayfield was repudiated by Rayfield by August 23, 1972. On that date, Rayfield entered into an agreement with the C.I.T. Company whereby C.I.T. would directly loan Rayfield the money necessary to pay Cook Equipment for the laundry machinery.[8] Pursuant to this agreement, Cook Equipment received payment for the machinery. By virtue of Rayfield's substitutions of the financing arrangements and his subsequent payment for the equipment, Tri-Continental's rights and obligations under its lease agreement with Rayfield were by-passed, and the agreement was thereby breached.

This now brings us to the cynosure of this appeal—whether or not there was sufficient evidence to show that the defendants mali-

evidence the defendants' knowledge of the existence of that contract.

6. Stanley Wieberg, vice-president of the Bank of St. Louis, and author of the letter of commitment, testified that he had conversations with Litzinger concerning an extension of the commitment. Wieberg stated that he told Litzinger that he would be agreeable to an extension so long as there were no changes in the lease and security agreements or changes in the cost of money. Wieberg stated on cross-examination that the commitment was not in fact extended past June 20, 1972. Litzinger testified that even if Tri-Continental had not obtained financing it would have paid for the equipment with its own funds.

7. The evidence is conflicting as to why Tri-Continental had not paid for the equipment. Litzinger's own testimony related above was corroborated by that of defendant Levin. In his deposition, Levin stated that Litzinger had informed him that payment of the equipment was contingent upon receipt of the delivery and acceptance form. Rayfield, however, testified that Litzinger had told him that the reason Tri-Continental had not made payment was due to its inability to obtain financing. Despite the

fact that Rayfield was the plaintiff's witness, "a party is not bound by the testimony of one of his witnesses in so far as such testimony is contradicted by that party's other evidence and a 'jury may believe all of the testimony of any witness or none of it, or may accept it in part or reject it in part; just as the jury finds it to be true or false when considered in relation to the other testimony and the facts and circumstances in a case.'" *Young v. Kansas City Southern Railway Company*, 374 S.W.2d 150, 153 (Mo.1964); *Hancock v. Light*, 435 S.W.2d 695 (Mo.App.1968). In light of this rule, as well as the principle that we must view the evidence in a light most favorable to the plaintiff, *Smith v. Allied Supermarkets, Inc.*, supra, we conclude that Tri-Continental's failure to pay for the equipment during July was due to Rayfield's failure to sign and deliver the requisite document.

8. In making this loan, C.I.T. did not require that Midwest execute any guarantee. However, there was a hold-back agreement with Neidhardt, similar to the one he had with Tri-Continental.

ciously induced Rayfield to supplant the financing of Rayfield's laundry equipment by Tri-Continental with C.I.T. and thereby breach his contract with Tri-Continental.

Under the old rule in Missouri, a defendant would only be liable for inducing breach of another's contract if his actions constituted fraud, deceit or coercion. *Glencoe Sand & Gravel Co. v. Hudson Bros. Commission Co.*, 138 Mo. 439, 40 S.W. 93 (1897). Merely advising, persuading or even threatening a party to a contract to breach it was not sufficient to create liability under the *Glencoe* doctrine.[9] However, *Glencoe* was overruled in 1953 by the Missouri Supreme Court in *Downey v. United Weather Proofing, Inc.*, supra. In *Downey*, the court rejected the requirement that fraud, deceit or coercion must be alleged and proven before liability will attach. The court said:

> "We believe the allegation and proof of the use of fraud, deceit or coercion as a means of inducing a breach of an existing contract should be considered non-essential to a recovery for inducing the breach of an existing contract, if, . . . there is alleged (and demonstrated) that the alleged wrongdoer maliciously, that is, with knowledge of the contract and without justifiable cause, induced the breach." *Id.*, 253 S.W.2d at 981. See also

*Cady v. Hartford Accident & Indemnity Co.*, supra.

Although the present rule is easily stated, we can find no Missouri case that actually defines what constitutes "inducement" under the doctrine set out in *Downey*.[10] With the paucity of Missouri law treating the subject, we turn to other jurisdictions which have ruled on the issue. See *Komosa v. Monsanto Chemical Company*, 317 S.W.2d 396 (Mo.banc 1958); *Interco, Inc. v. Randustrial Corp.*, 533 S.W.2d 257 (Mo.App.1976).

■ Webster's Third New International Dictionary Unabridged defines "induce": "to move and lead (as by persuasion or influence), to inspire, call forth or bring about by influence or stimulation." We find from the following cases from other jurisdictions that the concept of causation is inherent within the meaning of inducement; therefore, to establish liability in a tortious interference with contract case, the plaintiff must show that the defendant's acts caused the breach. Prosser, Law of Torts, 4th ed., 1971 at 934. And we find that other jurisdictions have characterized the causation element as requiring a showing that the defendant was "a moving cause" in the breach. *Burkheimer v. Thrifty Investment Co., Inc.*, 533 P.2d 449 (Wash.App.1975);[11] *Lanning v. Poulsbo Rural Telephone Association*, 8 Wash.App. 402,

9. The rationale underlying *Glencoe* was that if the defendant's acts fell short of fraud, deceit or coercion, the decision to breach the contract was made voluntarily by the breaching party. Since the breach was voluntary, the defendant would not be liable. "We are unable to see, in principle, that there is a difference between a breach induced by the advice, persuasion, or even threats, of a third party, and one caused by circumstances connected with the business or service the party contracted to do. In either case the breach of contract would be voluntary." *Glencoe Sand & Gravel Co. v. Hudson Bros. Commission Co.*, 138 Mo. 439, 40 S.W. 93, 94 (1897).

10. Restatement of Torts, § 766 (1939), Comment f, sets out various means of inducement: "There is no technical requirement as to the kind of conduct that may result in inducement. It may be any conduct which conveys to the third person the actor's desire to influence him not to deal with the other. Thus, it may be a simple request or persuasion which exerts only

moral pressure. Or it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made. Or it may be a threat by the actor of physical or economic harm to the third person, or to persons in whose welfare he is interested. Or it may be the promise of a benefit to the third person if he will refrain from dealing with the other." We are not convinced that all of the means of inducement included in this comment would be sufficient in and of themselves to constitute actionable inducement of breach of contract, e. g., "moral pressure." Obviously, imposition of all the conditions set forth in the Restatement would unrealistically trammel free enterprise and reasonable business competition.

11. As indicated in *Burkheimer v. Thrifty Investment Co., Inc.*, supra at 451, other courts characterize this causation element as either "proximate causation" or "factual causation."

507 P.2d 1218 (1973). See also Annot., 84 A.L.R. 43 (1933) s. 26 A.L.R.2d 1227 (1952). In determining whether the defendant's acts were a "moving cause" in the breach, courts apply what is essentially a "but for" test of causation. *United States v. Newbury Mfg. Co.,* 36 F.Supp. 602 (D.Mass. 1941); *Jensen v. Lundorff,* 258 Minn. 275, 103 N.W.2d 887 (1960); *Valley Land Office, Inc. v. O'Grady,* 72 Wash.2d 247, 432 P.2d 850 (1967) overruled on other grounds in *Nordstrom v. White Metal Rolling & Stamping Corp.,* 75 Wash.2d 629, 453 P.2d 619 (1969); *Burkheimer v. Thrifty Investment Co., Inc.,* supra; *Lanning v. Poulsbo Rural Telephone Association,* supra; Annot., 84 A.L.R. 43 (1933) s. 26 A.L.R.2d 1227 (1952). As stated in *United States v. Newbury Mfg. Co.,* supra at 605: "The rule presupposes that the party defaulting was ready, able and willing to perform and would have done so if it had not been prevented or persuaded by the malicious and unwarranted interférence of a third party." The following cases are illustrative of how courts have applied the "but for" test.

In *Lanning v. Poulsbo Rural Telephone Association,* supra, it was held that where the defendant's interference with a contract, though wrongful, was not the moving cause of the breach as the contract had already been repudiated by one of the parties.

In *Valley Land Office, Inc. v. O'Grady,* supra—a case closely akin to the situation in this case—as Rayfield expressed intention to breach the contract in any event—it was held that where one of the contracting parties (O'Grady) had already determined to rescind or breach his contract with plaintiff before entering into negotiations with defendants, there could be no finding of tortious interference:

"The only evidence in the record touching on the element of inducement is the testimony of Mr. O'Grady when called by the plaintiff and this testimony shows that Mr. O'Grady had already determined in his own mind that he had a bad deal and was going to see a lawyer before Fisher Realty's [defendant] men first discussed the [plaintiff's] option with him. To find that these defendants induced or purposely caused a breach of contract by Mr. O'Grady, we must find that they were a moving cause of his action in attempting to rescind the sale contract. We cannot so find . . . ." *Id.,* 432 P.2d at 856–57.

In *Burkheimer v. Thrifty Investment Co., Inc.,* supra, the court refused to find tortious interference where a decision to breach or repudiate a contract had already been made before defendant's involvement; thus, the defendant was held not to be the proximate cause or cause in fact of the breach, as the contract would have been breached without regard to the defendants' action.

In *Middleton v. Wallichs Music & Entertainment Co., Inc.,* 24 Ariz.App. 180, 536 P.2d 1072 (1975), a directed verdict for defendants was held proper where the facts demonstrated an affirmative and activated predisposition and action on the part of a party to a contract to breach the contract. Any basis for finding that the defendant had tortiously induced a breach of contract was thus negatived.[12]

■ To make his case, a plaintiff must show that the defendant actively and affirmatively took steps to induce the breach. But this factor alone should not be sufficient to establish liability. There must be an additional showing that the defendant's affirmative conduct caused the breach— that had it not been for the defendant's acts, the contract would have been performed. We therefore adopt the rule that the defendant's acts must be a moving cause of the breach and in so determining, we apply the "but for" test. Hence, to determine if a defendant wrongfully in-

12. But see *State Enterprises, Inc. v. Southridge Co-op. Sec. 1, Inc.,* 18 A.D.2d 226, 238 N.Y.S.2d 724 (1963), which seems to place emphasis as a triable issue on the defendants' conduct rather than on the conduct of the breaching party (whether the party to the contract would have been breached in any event).

duced the breach of a contract, we employ a two-step approach: 1) did the defendant actively and affirmatively take steps to induce the breach; and, if so, 2) would the contract have been performed absent the defendant's interference?

In our arbitrament of this legal battle, we now turn to the evidence produced by the plaintiff to determine whether it made a submissible case on the issue of whether these defendants induced Rayfield to repudiate his contract with Tri-Continental by re-financing the laundry equipment through C.I.T. And we examine the evidence involving defendant Neidhardt separately from that relating to defendants Levin and Midwest.[13]

■ The plaintiff's evidence showed that during the month of July, 1972, Neidhardt, as distributor of the laundry equipment involved in the Tri-Continental lease, was under continual pressure from the Cook Equipment Company concerning Tri-Continental's failure to pay for the equipment. Rayfield testified that in July, Neidhardt began to express concern about his relationship with Cook Equipment. Due to pressure from Cook, Neidhardt thought of superseding the financing of the laundry equipment with C.I.T. to ensure its prompt payment. In his deposition, Neidhardt stated:

"It was my idea to go to CIT and arrange financing so that I could get this thing paid off, because I was in trouble on it . . . So I could go ahead and * * get Cook Company paid because they were hounding me about that money all the time. Tri-Continental Leasing couldn't come up with the money; I went to CIT and told Lou Levin and he was

there when I got the payoff, sitting in the office."

Neidhardt also admitted that he initiated the contact with C.I.T. and requested the financing. This evidence is sufficient to satisfy the first part of the two-step test enunciated above—that Neidhardt actively and affirmatively took steps to induce Rayfield's breach. However, the record is devoid of any proof establishing the second part of this test—that had it not been for Neidhardt's participation, Rayfield would have honored his agreement with Tri-Continental. In fact, the only evidence on this point reveals that Rayfield intended to terminate his agreement with Tri-Continental regardless of anything Neidhardt may have done or planned to do. Rayfield, called as the plaintiff's witness, testified that as Tri-Continental had not paid for the equipment (due to their failure to obtain financing) he considered changing financing arrangements substantially before actual contact was made with C.I.T. He testified that it was his decision to apply to C.I.T. since he had previously financed another project through that organization. Rayfield also stated that he instructed Neidhardt to call C.I.T. on his behalf, for he believed that Neidhardt's influence might be helpful in obtaining the financing. From Rayfield's testimony, it is manifest that Rayfield, at the very least, was predisposed to breach his lease.[14]

Even were we to disregard Rayfield's testimony concerning his predisposition to breach, we would be constrained to hold that the plaintiff has not carried its burden of proving that had it not been for Neidhardt's participation in the decision to ex-

13. Midwest's liability is predicated upon the liability of Levin, due to the plaintiff's allegation that Levin was acting as an agent for Midwest when inducing Rayfield's breach.

14. It is apparent that there is a conflict between Rayfield's testimony and Neidhardt's as to whose idea it was to switch the financing to C.I.T. Since a plaintiff may contradict the testimony of one of his witnesses by testimony of other witnesses, *Young v. Kansas City Southern Railway Company*, supra; *Hancock v. Light*, supra, and since we must view the evidence in the light most favorable to the plaintiff, *Smith v. Allied Supermarkets, Inc.*, supra, we are bound to conclude that it was Neidhardt's idea to go to C.I.T. However, regardless of whose idea it was to switch financing to C.I.T., Rayfield's testimony can be looked to on the issue of whether he would have breached the contract despite Neidhardt's participation. Thus, his testimony demonstrates that he was predisposed to breach his lease agreement with Tri-Continental.

change financing arrangements the contract with Tri-Continental would have been performed. There is no evidence, direct or circumstantial, that would permit the jury to find, without resort to speculation or conjecture, that Rayfield would have performed "but for" Neidhardt's actions. Because a jury cannot resort to such speculation and conjecture, *Esmar v. Zurich Insurance Co.,* 485 S.W.2d 417 (Mo.1972); *Merriman v. Johnson,* supra, the plaintiff has failed to show by substantial evidence that Neidhardt induced the breach of plaintiff's contract with Rayfield, and, as previously noted we cannot make plaintiff's case by the supply or conjuration of needed evidence.

■ We now turn to whether the plaintiff has met its burden of producing sufficient evidence showing that Levin, either as an individual or as an agent for Midwest, was a moving cause in inveigling Rayfield to breach his lease agreement with Tri-Continental. To support its allegation, plaintiff points to various facts which it claims support the inference that Levin was such a moving cause. The evidence shows that about the time the decision to switch financing to C.I.T. was made, Rayfield became concerned over the fact that Tri-Continental was holding a second deed of trust on his home. Inasmuch as Rayfield had already decided to terminate arrangements with Tri-Continental, he was anxious to retrieve the deed of trust, and to achieve its return, he enlisted the aid of Levin. According to the testimony of Litzinger, Levin had told Rayfield that Tri-Continental owed him a favor and that he believed he could persuade Tri-Continental to return the deed to Rayfield. There is no dispute that Levin did go to Litzinger and request that Rayfield's documents be returned. This meeting occurred either on August 12 or 14, several days before Rayfield actually signed the loan agreement with C.I.T. Litzinger also testified that at this meeting, Levin informed him that Rayfield had decided to supplant financing with C.I.T.[15] When asked the reason for the change Levin told Litzinger that C.I.T. did not require Midwest to guarantee the loan, (unlike the Tri-Continental arrangement), and therefore Midwest preferred that Rayfield use C.I.T. There was also testimony that Levin had told Rayfield that as C.I.T. did not require a guarantee, Levin or Midwest would agree to help Rayfield subsequently if Rayfield desired to open a second laundromat. Presumably this assistance would be in the form of a guarantee on a lease of equipment needed in the second location. While this evidence demonstrates that the change to C.I.T. was in the best interest of Levin and Midwest, e. g., Midwest would be able to avoid the lease purchase agreement it had with Tri-Continental whereby it would be liable up to $20,000 if Rayfield defaulted, it does not establish that Levin actively and affirmatively enticed Rayfield into the breach, nor does it establish that Rayfield would have performed the contract with Tri-Continental "but for" the actions and promises of Levin. There is nothing in the record to show that Levin's agreement to attempt to retrieve the deed of trust from Tri-Continental occurred prior to Rayfield's decision to switch financing. In fact, the only evidence in the record on this question indicates that Levin's activities occurred after Rayfield had made his decision to supersede financing arrangements. When asked whether he had any discussion with Levin regarding the change, Rayfield responded: "Only after I had made up my mind what I wanted to do." This uncontradicted testimony was elicited from the plaintiff's own witness, and plaintiff is thus bound thereby. *Silberstein v. Berwald,* 460 S.W.2d 707 (Mo. 1970); *Talley v. Bowen Construction Company,* 340 S.W.2d 701 (Mo.1960); *Reece v. Reed,* 326 S.W.2d 67 (Mo.1959). Even if we were to disregard Rayfield's testimony on this matter, there is no evidence, nor can it be inferred, that Levin's actions occurred prior to Rayfield's decision to breach his lease agreement. The jury would have to

---

**15.** At this meeting on August 12 or 14, Levin told Litzinger that the switch had either been or was about to be consummated.

resort to conjecture and speculation in order to find that Levin's actions occurred before this decision, which is, of course, impermissible. *Esmar v. Zurich Insurance Co.,* supra; *Merriman v. Johnson,* supra. Thus, the plaintiff has failed to show by substantial evidence that Levin actively and affirmatively induced the breach of Tri-Continental's contract. Inasmuch as the plaintiff's proof fails as to this aspect of the principle enunciated above, it also fails as to the second part of the test—that Rayfield would have performed the contract with Tri-Continental "but for" the actions of Levin. No case was made against Levin in either his individual or agency capacity. Therefore, Midwest cannot be found liable.

■ We recognize, of course, that the question of proximate cause is ordinarily for jury determination. *Pollard v. General Elevator Engineering Co.,* 416 S.W.2d 90 (Mo.1963); *Robinson v. St. John's Medical Center,* Joplin, 508 S.W.2d 7 (Mo.App. 1974). But the jury question was removed in this case, for the only evidence presented was that Rayfield had positively determined to repudiate the contract with Tri-Continental prior to any action taken by defendants. The record is barren of evidence to link defendants with any enticement of Rayfield to abrogate his contractual obligations with Tri-Continental. There was no evidence of any causal connection between Rayfield's expressed intent to repudiate the contract and the actions of defendants. And causal connection must be proved by evidence and not mere speculation and conjecture. *Pollard v. General Elevator Engineering Co.,* supra. We also believe our decision on the particular facts of this case is essential to maintain a reasonable business stability and eschew unnecessary shackles on competitive enterprise. But this decision should not be interpreted as palliation for the offense of tortious interference with contract. We only say that under the facts of this case, measured by the requisite proof, the plaintiff has failed to prove that defendants induced and caused Rayfield to breach his contract with plaintiff; that, therefore, the trial court was correct in sustaining defendants' motions for directed verdict.

We therefore hold that the trial court properly set aside the jury verdict for the plaintiff, and the trial court's order entering judgment for the defendants is affirmed.

SIMEONE, P. J., and KELLY, J., concur.